**UNITED STATES of America**

v.

**Brian OSTROFF, a/k/a "Jassett Byron," a/k/a "Zachary A. Maxwin," a/k/a "Max Gould," a/k/a "Connor Beresford," a/k/a "Byron C. Beresford," a/k/a "Balzac B. Vandergrift," a/k/a "Andre Armitage," Defendant.**

**No. 94 CR 17(SAS).**

United States District Court, S.D. New York.

May 13, 2004.

Robert M. Baum, The Legal Aid Society, Federal Defender Services Unit, New York, New York, for Defendant.

David S. Leibowitz, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York, New York, for the Government.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On October 29, 1993, agents of the Federal Bureau of Investigation arrested, fingerprinted, and processed defendant Brian Ostroff in New York.[1] He was not charged, and was released the following day. On January 11, 1994, Ostroff was indicted in this district for violating section 1001 of Title 18 (the "Indictment"). Specifically, he was charged with identifying himself as "Max Gould" when he was questioned by an FBI agent on October 29, 2003; the Government contends that this statement was materially false. It was not until September 16, 2003, that Ostroff was arrested on this Indictment. Not surprisingly, he now moves to dismiss the Indictment on the ground that the Government has violated his Sixth Amendment right to a speedy trial.

## I. BACKGROUND

According to the Government, on October 29, 1993, Brian Ostroff told Special Agent Mark Thomas Rossini that his name was "Max Gould," and "never told the law enforcement agents his real name." Government's Memorandum in Opposition to the Defendant's Motion to Dismiss the Indictment ("Gov't Opp.") at 2. The Government did not learn until "later" that the defendant's real name is Brian Ostroff. *See id.* at 2. Nonetheless, by January 11, 1994, the Government had figured out Ostroff's name,[2] because on that day the

---

1. The Government provides no information regarding the basis for this arrest.

2. The Government contends that when it released Ostroff on October 30, 1993, he was given a grand jury subpoena requiring him to testify on November 16, 2003, and that he failed to appear. *See* Gov't Opp. at 2. Ostroff denies that he was given a subpoena, and the Government has been unable to produce a copy of the subpoena. *See* Reply Memorandum of Law in Support of Defendant Brian Ostroff's Motion to Dismiss the Indictment ("Def.Rep.") at 5. It is therefore impossible to determine whether the Government knew the defendant's real name on October 30, 1994, the date the subpoena was purportedly served.

Grand Jury returned the Indictment styled "United States v. Brian Ostroff."[3] *See* Indictment, Ex. A to the Affirmation of Robert M. Baum ("Baum Aff."), defendant's counsel. The following day, a warrant was issued for Ostroff's arrest.

## A. The Defendant's Post–Indictment Conduct

Ostroff claims that until he was arrested in 2003, he was unaware of the Indictment. From 1993 until 2000, his permanent address was in South Fallsburg, New York. Notably, this was also his address at the time of his 1993 arrest. Between 1997 and 1999, Ostroff lived in Boston; he filed a "temporary forwarding of mail" with the South Fallsburg post office, identifying his postal address in Boston. *See* 3/25/04 Affirmation of Brian Ostroff ("Ostroff Aff.") ¶¶ 4, 8.

While in Boston, Ostroff was arrested twice, once in 1997 and once in 1999. On both occasions, he identified himself as "Nicholas Young," his "stage name." *See id.* ¶ 8. Though it is not clear how long Ostroff was detained following the 1997 arrest, the 1999 arrest led to a one month incarceration. *See* Def. Rep. at 6. Before being released in both 1997 and 1999, Ostroff was fingerprinted; he was specifically told that his prints would be used to conduct a "warrant check" with the FBI. Following the fingerprinting, Ostroff was informed that no other cases were pending against him, and there were no outstanding warrants for his arrest. *See* Ostroff Aff. ¶ 8.

In 2000, Ostroff moved to Delray Beach, Florida, and resided openly and continuously under his own name and at the same address. Sometime in 2000, Ostroff applied for a replacement Social Security card, appearing in person at the Social Security Administration, where he was required to complete official paper work. The same year, he obtained a library card in Palm Beach County. He also registered with the Florida Department of Children and Family Services as the care giver for his mother, who suffers from Alzheimer's Disease. *See id.* ¶¶ 11, 12, 15, 16. On September 11, 2000, Ostroff registered to vote under his Delray Beach address. *See id.* ¶ 12; Voter Registration Card, Ex. D. to the Baum Aff.

Between 2001 and 2003, Ostroff continued to live openly under his own name. Throughout 2001, he attended Dade County Community College as a registered student. *See* Ostroff Aff. ¶ 13. On May 9, 2001, the Florida Department of Motor Vehicles issued a driver's license to Ostroff, identifying his Delray Beach, address. *See* Photocopy of Driver's License, Ex. B to the Baum Aff. And on June 5, 2002, Ostroff registered his automobile with the State of Florida. *See* Ostroff Aff. ¶ 14; State of Florida Automobile Certificate of Title, Ex. E to the Baum Aff. That registration listed his Delray Beach address. *See id.* He also voted in elections. Finally, throughout the period 1993 to 2003, Ostroff purchased airline tickets on major airlines, and rented cars from national car rental companies, under his own name. *See* Ostroff Aff. ¶¶ 7, 12.

## B. The Government's Post–Indictment Conduct

The Government submits that throughout the period spanning January, 1994 through September, 2003, it "diligently" sought to apprehend Ostroff. Specifically, in 1994, the FBI briefly placed a pen register on Ostroff's *sister's* telephone, and informed Ostroff's father that there was an outstanding warrant for Ostroff's arrest.[4]

---

**3.** The Indictment identifies the defendant has having seven aliases, including "Max Gould." However, the Indictment also included his real name—Brian Ostroff.

**4.** According to Ostroff, his parents never told him that law enforcement officers were looking for him. *See* Ostroff Aff. ¶ 17.

In both 1994 and 1995, the FBI notified the South Fallsburg Police Department of the outstanding warrant, and the Police Department agreed to "periodically surveil" Ostroff's permanent address, though it appears that the FBI never followed up with the Police Department. The FBI also informed the Immigration and Naturalization Service of the warrant in 1994. *See* Affirmation of James H. Hilliard, Jr., Special Agent with the FBI ("Hilliard Aff."), Ex. A to the Gov't Opp. ¶¶ 2(a), 2(b), 2(d), 2(c), 2(e).

In the following years, the FBI did annual "criminal history checks" for Ostroff, and periodically executed "Department of Motor Vehicle checks". *See id.* ¶¶ 2(f), 2(h), 2(i), 2(m), 2(p), 2(q), 2(t). In 1995, the FBI served a grand jury subpoena on financial institutions purportedly used by Ostroff. These "checks" and the subpoena apparently revealed no information regarding Ostroff's whereabouts.

In 1997, the Cambridge, Massachusetts Police Department informed the FBI that it had recovered a car registered to Ostroff's father, and known to be used by Ostroff. The following year, the Suffolk County (Massachusetts) District Attorney's Office informed the FBI that in 1997, Brian Ostroff, using the name "Nicholas Young," had been arrested in Boston and released. *See id.* ¶¶ 2(k), (*l*). It does not appear that the FBI followed up on any of this information; it is unclear whether the FBI was even aware that Ostroff, still using the name "Nicholas Young," was arrested in Boston *again* in 1999, and held in custody for one month.

In June, 2001, the FBI determined, through a database inquiry, that Ostroff was living in Miami, Florida. A year later, in May, 2002, the FBI performed another database inquiry, and determined that Os-troff was living in Delray Beach, Florida. The following January, FBI agents went to the Delray Beach address and interviewed Ostroff's mother; according to the FBI, she did not provide specific details about his whereabouts, and was "evasive."[5] In the following months, the FBI twice interviewed Ostroff's sister. *See id.* ¶¶ 2(s), 2(u), 2(x), 2(y). Soon thereafter, Ostroff was apprehended.

## II. APPLICABLE LAW

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ..." U.S. Const. amend. VI. "[T]he right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, 'We will sell to no man, we will not deny or defer to any man either justice or right.'" *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (quoting Magna Carta, c. 29 (c. 40 of King John's Charter of 1215) (1225), translated and quoted in Coke, The Second Part of the Institutes of the Laws of England 45 (Brooke, 5th ed., 1797)).

A court faced with an alleged violation of the right to a speedy trial must first determine whether the length of the delay between accusation and trial is "presumptively prejudicial." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Second Circuit has noted that there is a "general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not." *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir.1992) (citing

---

**5.** Ostroff's mother suffers from severe Alzheimer's Disease. *See* Ostroff Aff. ¶ 18. Thus, it seems likely that the FBI agents mis-took the symptoms of Ms. Ostroff's condition for "evasiveness."

Gregory P.N. Joseph, *Speedy Trial Rights in Application,* 48 Fordham L.Rev. 611, 623 n. 71 (1980)).

██ If the delay meets the "presumptively prejudicial" standard, courts consider four factors to determine whether the defendant's Sixth Amendment right to a speedy trial has been violated: (1) whether the delay before trial was "uncommonly long"; [6] (2) whether the Government or the defendant is "more to blame for the delay"; (3) whether the defendant asserted his right to a speedy trial "in due course"; and (4) whether the defendant "suffered prejudice" as a result of the delay. *Doggett,* 505 U.S. at 651, 112 S.Ct. 2686 (citing *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). "[T]hese factors have no 'talismanic qualities,' and none is 'either a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial.' Rather, they are 'related factors' that 'must be considered together with such other circumstances as may be relevant.'" *Flowers v. Warden,* 853 F.2d 131, 133 (2d Cir.1988) (citation omitted) (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. 2182).

██ With respect to the first factor, there is no clear definition for an "uncommonly long" delay, and courts consider the complexity of the crime in making this determination. "[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. However, the Supreme Court has found delays of six years in a murder case, and eight years in a

prosecution for conspiracy to import cocaine, to be "extraordinary." *See Barker,* 407 U.S. at 533, 92 S.Ct. 2182 (murder); *Doggett,* 505 U.S. at 652, 112 S.Ct. 2686 (conspiracy to import cocaine).

██ The second factor requires the court to determine whether the Government is more to blame for the delay than the defendant. Where the Government intentionally delays in order to gain an advantage at trial, this factor weighs heavily against the Government. *See Barker,* 407 U.S. at 531, 92 S.Ct. 2182. However, even where the delay is caused by the Government's mere negligence, this factor must still weigh against the Government, albeit less heavily, because the Government bears "ultimate responsibility." *Id.* The Government can justify the delay where there is a valid reason, or it is caused by the defendant. *See id.*

██ The defendant's assertion of his right to a speedy trial, the third factor, appears to be most relevant in the context of a habeas petition based on the denial of the defendant's right to a speedy trial, where that right was not raised in trial court, or was raised late. *See id.* at 524–30, 92 S.Ct. 2182 (discussing and rejecting a trend among the circuit courts requiring a defendant to "demand or waive" the right to a speedy trial). Nonetheless, this factor must be considered in all speedy trial inquiries. Notably, where the defendant is unaware of the indictment, he cannot "be taxed for invoking his speedy trial right only after his arrest." *Doggett,* 505 U.S. at 654, 112 S.Ct. 2686.

---

**6.** This factor is often merged with the initial inquiry regarding whether the length of the delay warrants judicial review because if the accused demonstrates that the delay was presumptively prejudicial, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States,* 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *see also United States v. Solomon,* No. 95 Cr. 154, 1996 WL 399814, at * 4 (S.D.N.Y. July 16, 1996) (concluding that a twenty-month delay between indictment and arrest is sufficient to trigger judicial review because it is presumptively prejudicial, but is not uncommonly long).

■ The fourth factor, prejudice to the defendant,

> should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, *the most serious is the last,* because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. *If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if witnesses are unable to recall accurately events of the distant past.* Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker,* 407 U.S. at 532, 92 S.Ct. 2182 (emphases added); *see also Doggett,* 505 U.S. at 654, 112 S.Ct. 2686.

■ The determination of whether the defendant has been prejudiced is related to the length of the delay, and the reason for that delay. Thus, delay caused by the Government's negligence is not as prejudicial as intentional delay, but "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.... [T]he weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." *Doggett,* 505 U.S. at 657, 112 S.Ct. 2686. Where the defendant asserts prejudice, either general or particularized, as a result of a delay, the Government has an affirmative burden to rebut that claim. *See id.* at 658, 112 S.Ct. 2686.

## III. DISCUSSION

Ostroff was indicted on January 11, 1994. He was arrested on September 16, 2003. It is undisputed that the length of the delay—nearly ten years between indictment and arrest—not only warrants judicial review, but is "uncommonly long." *See* Gov't Opp. at 10. Thus, I need only consider the remaining three *Doggett* factors.

### A. Cause of the Delay

■ The Government contends that Ostroff is responsible for the delay, arguing that he intentionally concealed his identity in 1993, and again when he was arrested in Boston, thereby evading the Government's diligent efforts to locate him. This argument is without merit.

Even if Ostroff provided a false name at the time of his arrest in late October, 1993, the Government clearly knew his true identify in early 1994 because he was indicted under the correct name. Thus, the fact that Ostroff purportedly concealed his identity in 1993 cannot be the cause of the Government's failure to apprehend him for nearly ten years.

It is perhaps excusable that the Government did not find Ostroff when he was arrested in Boston in 1997 because Ostroff told the Boston police that his name was "Nicholas Young," and the Boston police were apparently unable to coordinate their fingerprint check with the FBI's fingerprint database. *See id.* at 12. Nonetheless, in 1998, state officials in Massachusetts *informed* the FBI that Ostroff had been arrested in Boston in 1997, under the name "Nicholas Young." Thus, it is *not* excusable that when Ostroff was again arrested in Boston in 1999 under the name "Nicholas Young," the FBI could not locate him. This is particularly true given that Ostroff was in custody for an entire month, and the Massachusetts police notified the FBI of his 1997 arrest, which indicates that the Massachusetts authorities knew of the FBI's interest in Ostroff.

Moreover, the fact that Ostroff used the name "Nicholas Young" at the time of his arrests in 1997 and 1999 does not explain why the FBI could not locate him from 1994 until 1997, or after 1999, when he was living openly under his own name. Indeed, the Government cites a number of actions it took in its "diligent" effort to locate Ostroff. But entire years went by when the Government did little more than annual "criminal checks" and "Department of Motor Vehicle checks." *See* Hilliard Aff. ¶¶ 2(h)-(j), 2(n)-(r). In the years that the Government acted slightly more "diligently," there appears to have been no follow-up. Thus, in 1994 and 1995, the FBI told the South Fallsburg Police Department of the outstanding warrant, but did not check to make sure that the South Fallsburg police were actually surveilling Ostroff's permanent address; and the FBI apparently undertook no surveillance itself. Similarly, after being told of Ostroff's presence in Boston, and the fact that he was using the name "Nicholas Young," the FBI apparently made no further inquiries in Massachusetts.

After learning in 2001 that Ostroff had moved to Florida, the FBI undertook very limited efforts to find him.[7] *See id.* ¶¶ 2(s)-(v). This is demonstrated by the fact that Ostroff had filed paper work or registered with nearly every conceivable Federal, state and local agency: the Social Security Administration, voter registration, the Florida Department of Children and Family Services, Dade County Community College, the Department of Motor Vehicles (as both a driver and a car owner), and the public library. *See supra,* Part I.A. Given Ostroff's activities, if the Government had acted as diligently in its

pursuit of Ostroff as it claims, it would have found him.

Thus, the facts of this case are very similar to the facts of *Doggett.* There, the defendant was indicted, and the Government sought to arrest him at his parents' home. When officers of the Drug Enforcement Agency ("DEA") arrived, Doggett's parents informed them that Doggett had left for Columbia. Thereafter, the DEA notified U.S. Customs of the warrant, and entered Doggett's name into various databases. A year later, the DEA learned that Doggett had been arrested in Panama; no extradition request was filed, and Doggett was released without being turned over to the United States. The following year, Doggett returned to the United States. The Government did not notice his return that year or in the following six years, despite the fact that Doggett lived openly under his own name; the Government assumed that he was abroad, and therefore made no serious effort to locate or apprehend him. Ultimately, a credit check revealed his whereabouts in "minutes." *See Doggett,* 505 U.S. at 649–50, 112 S.Ct. 2686. The Court concluded that the Government's "lethargy" in seeking to find Doggett constituted "findable negligence." *Id.* at 653, 112 S.Ct. 2686.

I reach the same conclusion with respect to Ostroff. In the nearly ten years between Ostroff's indictment and arrest, the Government undertook little effort to find him. Perhaps this failure was a result of an erroneous belief that Ostroff was living under aliases that would make him difficult to locate. Or perhaps it reflects Ostroff's "relative unimportance." *Doggett,* 505 U.S. at 653, 112 S.Ct. 2686. But whatever the reason, I have no doubt that the Gov-

---

7. I am mystified by the FBI's June, 2001, database inquiry that purportedly revealed that Ostroff was living in Miami, Florida. Just *one month* before that search, the Florida

Department of Motor Vehicles issued a driver's license to Ostroff that identified his Delray Beach address. *See* Photocopy of Driver's License, Ex. B to the Baum Aff.

ernment is more responsible than Ostroff for the delay. Therefore, this factor weighs against the Government.

## B. Assertion of the Right to a Speedy Trial

■■■ Ostroff contends that he was not aware of the Indictment until his arrest in 2003. *See* Def. Mem. at 10. He asserted his right to a speedy trial soon after the arrest. The Government argues that Ostroff's lack of knowledge is "suspect" because law enforcement agents told Ostroff's father about the Indictment in 1994, and informed Ostroff's sister of the Indictment in 2003. The Government claims that "any contact with either of them would have led to the defendant's learning of his indictment," Gov't Opp. at 13, and urges the Court to conduct a hearing on the issue of whether Ostroff knew about the Indictment before his 2003 arrest.

As an initial matter, the Government did not tell Ostroff's sister about the Indictment until March, 2003, approximately six months before he was arrested. *See* Hilliard Aff. ¶ 2(x). Thus, even if Ostroff learned of the Indictment from his sister, his assertion of the right to a speedy trial occurred relatively soon thereafter. More importantly, the Government's theory that Ostroff's father must have told Ostroff about the Indictment cannot be proven. Ostroff's father died in 2000, *see* Ostroff Aff. ¶ 10, and he is therefore unable to testify at the hearing the Government proposes. And because Ostroff's mother has severe Alzheimer's, she is unable to testify regarding whether her husband told Ostroff that there was a warrant for his arrest. Accordingly, a hearing on this issue would not be productive. Because the Government can offer no evidence as to when Ostroff learned of the Indictment, I conclude that he did not learn of it until 2003. Therefore, he timely asserted his right to a speedy trial, and this factor also weighs against the Government. *See Dog-*

*gett,* 505 U.S. at 653, 112 S.Ct. 2686 (defendant timely asserted right to a speedy trial where the record demonstrated that he did not know he had been indicted until he was arrested, despite the fact that his parents had been told eight years earlier).

## C. Prejudice

The Government argues that Ostroff cannot show any specific prejudice as a result of the delay. In support of this argument, the Government claims that Ostroff's false statement regarding his name was material to a 1993 mail fraud investigation, and that because the Government intends to prove its case entirely through the testimony of law enforcement agents and documentary evidence, the delay could not have hindered Ostroff's "ability to litigate the issue of materiality." Gov't Opp. at 14.

■■■ Ostroff counters that he has been "severely prejudiced by the delay" because his mother and father, who are no longer available to testify, "were both crucial witnesses who would have addressed the issue of whether the alleged false statement was material, a fact that the government must prove beyond a reasonable doubt." Def. Mem. at 11. According to Ostroff, prior to his 1993 arrest, FBI agents visited his home and spoke to his parents. During the course of the visit, Ostroff's parents provided the agents with a physical description of Ostroff, and showed them a recent photograph of him. Therefore, Ostroff argues, at the time of his 1993 arrest, the FBI knew who he was, and his providing the agents with a false name could not have been material to any on-going investigation. *See id.* at 8.

Ostroff has thus identified "particularized trial prejudice" that he will suffer as a result of the delay. *Doggett,* 505 U.S. at 657, 112 S.Ct. 2686. Specifically, because of the delay, Ostroff's ability to of-

fer a defense to the allegations is severely jeopardized: his parents are no longer available to testify regarding the FBI's knowledge of his identity prior to the 1993 arrest.[8] Moreover, Ostroff is not *required* to demonstrate any specific prejudice because prejudice is *presumed* where there is a "prolonged and unjustifiable delay[ ] in prosecution," and "over time[,] the presumption of evidentiary prejudice grows." *Id.* This is because "time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* at 655, 112 S.Ct. 2686 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182).

The Government has failed to persuasively rebut the particularized prejudice identified by Ostroff, and has not even overcome the presumption of prejudice that attaches to this extraordinarily long delay. As such, this factor weighs heavily against the Government.

### D. The *Doggett* Factors Require Dismissal

 All four of the *Doggett* factors weigh against the Government. Specifically, the ten-year delay between the Indictment and Ostroff's arrest is uncommonly long, and was the result of the Government's negligence in pursuing him. *See supra*, Part III.A. Ostroff timely asserted his right to a speedy trial, and if he were required to proceed to trial, he would be severely prejudiced by the delay. *See id.*, Part III.B–C. Therefore, he is entitled to relief, and the Indictment is dismissed.

In reaching this conclusion, I emphasize the wisdom of the Supreme Court articulated in *Doggett*: "The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it." 505 U.S. at 657, 112 S.Ct. 2686.

### IV. CONCLUSION

For the foregoing reasons, Ostroff's motion to dismiss the Indictment is granted. The Clerk of the Court is directed to close this motion [docket # s 11, 13] and this case.

SO ORDERED.

---

8. Notably, Ostroff's parents are no longer able to testify because his father died in 2000, and his mother suffers from severe Alzheimer's Disease. This is *precisely* the type of prejudice that the Supreme Court identified as "obvious" in *Barker*. *See Barker*, 407 U.S. at 532, 92 S.Ct. 2182 ("If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the past.").