[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 09-11348

————————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 13, 2010
JOHN LEY
CLERK

D. C. Docket No. 98-00028-CR-5-RS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR GARCIA VILLARREAL,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Florida

————————————————

(August 13, 2010)

Before TJOFLAT, WILSON and EBEL,[*] Circuit Judges.

EBEL, Circuit Judge:

---

[*]Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Defendant-Appellant Victor Garcia Villarreal entered a conditional plea of guilty to a charge of conspiring to distribute marijuana. He reserved his right to challenge the district court's denial of his motion to dismiss the indictment against him on grounds that the government deprived him of his constitutional right to a speedy trial, and he now raises that challenge on appeal. He also challenges the procedural and substantive reasonableness of his sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and for the reasons that follow, we affirm in all respects.

## BACKGROUND

The first link in the chain of events that ultimately brought about Villarreal's arrest and conviction dates at least as far back as February 1997. At that time, law enforcement officers seized a load of marijuana and arrested an individual who implicated Cristobal Santos Salinas in drug distribution activities. The arrest of Santos Salinas led law enforcement to arrange a controlled drug buy and bust operation leading to the arrest of Gerald Ward. Gerald Ward's arrest led law enforcement to arrange another controlled buy in Florida in December 1997, which resulted in the arrest of three individuals, Jesus Rodriguez Diaz, Mario Ruiz, and Israel

2

Cantu, as well as the seizure of a tractor-trailer carrying 840 pounds of marijuana. All three of these individuals implicated Villarreal in a drug distribution scheme, and law enforcement discovered documents identifying Villarreal as the owner of the tractor-trailer. This drug bust confirmed law enforcement suspicions that Villarreal was orchestrating a large-scale drug distribution scheme.

The December 1997 drug bust in Florida ultimately led a grand jury to indict Villarreal, along with two other individuals, in July 1998. Villarreal was charged with two counts of drug distribution.[1] Federal agents, however, were unable to arrest Villarreal until January 2008, nearly ten years later. As a result, Villarreal filed two substantively identical motions moving to dismiss the indictment against him on grounds that the government deprived him of his constitutional right to a speedy trial. After the district court denied Villarreal's speedy trial motions, Villarreal entered a conditional guilty plea in September 2008, reserving his right to appeal the district court's order regarding his speedy

---

[1] A grand jury subsequently issued a superseding indictment that modified the counts against Villarreal to add specific quantities of marijuana to the charges.

trial claim.[2] He pled guilty to the first count, which alleged that he and the two other individuals charged in the indictment "did knowingly and willfully combine, conspire, confederate, and agree together and with other persons to distribute and possess with intent to distribute more than one thousand (1000) kilograms of marijuana, in violation of" 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). (R. v.1 Doc. 41 at 1.) The second count was dismissed upon the government's motion.

The district court subsequently sentenced Villarreal to 328 months' imprisonment. The district court determined that Villarreal had a base offense level of 36 because more than 10,000 kilograms of marijuana were attributable to him. See U.S.S.G. § 2D1.1(c)(2). The final adjusted offense level, however, was 40 after taking into account (1) a two-level decrease for acceptance of responsibility, see id. § 3E1.1(a), (2) a two-level increase for possession of a firearm, see id. § 2D1.1(b)(1), and (3) a

---

[2] Federal Rule of Criminal Procedure 11(a)(2) requires that a defendant "reserv[e] in writing the right to have an appellate court review an adverse determination of a specified pretrial motion." Villarreal does not appear to have reserved in writing the right to appeal the district court's adverse speedy trial ruling. Nonetheless, in this case, we may act as if Villarreal "properly reserved the right to appeal" that adverse decision because the government does not argue for enforcement of the writing requirement and the district court clearly consented to the conditional plea. See United States v. Sanchez, 269 F.3d 1250, 1255 n.7 (11th Cir. 2001), abrogated in part on other grounds by United States v. Duncan, 400 F.3d 1297, 1308 (11th Cir. 2005).

4

four-level increase for serving as an organizer or leader of a crime involving five or more participants, see id. § 3B1.1(a).  Villarreal had a criminal history category of I.  The combination of these figures yielded an advisory guidelines range sentence of 292 to 365 months' imprisonment.  Thus, the district court's sentence of 328 months' imprisonment fell in the middle of the advisory guidelines range.

## DISCUSSION

I.    Speedy Trial

Villarreal first argues that the lengthy delay between his indictment in July 1998 and his arrest in January 2008 deprived him of his constitutional right to a speedy trial.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.[3]  This right "is as fundamental as any of the rights secured by the Sixth Amendment." Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  Because of the unique policies underlying this right, a court must set aside any judgment

---

[3] The Speedy Trial Act, 18 U.S.C. §§ 3161-74, provides further protections to ensure defendants receive a speedy trial.  Those statutory protections, however, are not at issue here because Villarreal raises only a Sixth Amendment challenge to the delay between his indictment and arrest.

5

of conviction, vacate any sentence imposed, and dismiss the indictment if it finds a violation of the defendant's right to a speedy trial. See Strunk v. United States, 412 U.S. 434, 440 (1973) ("In light of the policies which underlie the right to a speedy trial, dismissal must remain, as Barker noted, 'the only possible remedy.'") (quoting Barker v. Wingo, 407 U.S. 514, 522 (1972)). For the reasons that follow, however, we need not employ this extraordinary remedy here because we conclude the government did not deprive Villarreal of his constitutional right to a speedy trial.

## A. **STANDARD OF REVIEW**

Whether the government deprived a defendant of his constitutional right to a speedy trial presents a mixed question of law and fact. United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006). We review the district court's legal conclusions de novo, and we review its factual findings for clear error. Id. A factual finding is clearly erroneous only if, after we review the evidence, we are left with "the definite and firm conviction that a mistake has been committed." United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (quotations omitted). And "we allot substantial deference to the factfinder, in this case, the district court, in

6

reaching credibility determinations with respect to witness testimony." Id. (quotation omitted.)

## B. ANALYSIS

We employ a balancing test rooted in functional considerations to ascertain whether a delay in a defendant's trial deprived him of his constitutional right to a speedy trial. See Barker, 407 U.S. at 522, 530 (explaining that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case" and setting forth four factors for courts to consider). The balancing test requires us to weigh the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the actual prejudice borne by the defendant. Id. at 530; Ingram, 446 F.3d at 1336. After balancing these factors, we conclude that the government did not deprive Villarreal of his speedy trial rights.

### 1. The Length of the Delay

The first factor of the balancing test actually serves as a "double enquiry." Doggett v. United States, 505 U.S. 647, 651 (1992). First, it serves as a threshold inquiry that the defendant must satisfy in order for us

to weigh the remaining three factors. See Barker, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). To satisfy this threshold inquiry the defendant "'must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay.'" Ingram, 446 F.3d at 1336 (quoting Doggett, 505 U.S. at 651-52). If, and only if, the defendant satisfies this threshold inquiry will we proceed to address the remaining three factors of the Barker balancing test. Id.

The second part of our inquiry under this factor examines "the extent to which the delay stretches beyond the bare minimum needed" to satisfy the threshold showing of presumptive prejudice. Doggett, 505 U.S. at 652. The longer the pretrial delay extended beyond the "bare minimum" necessary to show presumptive prejudice, the stronger the presumption that the pretrial delay prejudiced the defendant. See id. at 652, 655-57. The length of the delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted, and a particularly lengthy delay may also affect our analysis of the fourth Barker factor. See id.; see also United States v. Smith, 94 F.3d

8

204, 209 (6th Cir. 1996) ("[I]f the constitutional inquiry has been triggered, the length of delay is itself balanced with the other factors and may, in extreme circumstances, give rise to a strong presumption of evidentiary prejudice affecting the fourth Barker factor.") (quotations omitted).

To resolve these two inquiries, we must first determine the length of the pretrial delay. To do so, we calculate the time that elapsed between "when the Sixth Amendment right attached until trial (or, until the pretrial motion to dismiss on this ground is determined)." 5 Wayne R. LaFave, et al., Criminal Procedure § 18.2(b) (3d ed. Thomson/West 2007) (footnotes omitted). Here, Villarreal's speedy trial right attached in July 1998 when a federal grand jury indicted him. The government arrested Villarreal in January 2008, the court denied his motion to dismiss the indictment on speedy trial grounds in May 2008, and Villarreal ultimately pled guilty in September 2008. Thus, Villarreal endured a delay of approximately ten years.

The ten-year delay in this case clearly satisfies the threshold inquiry of presumptive prejudice. The government has conceded this point (Aple. Br. at 27), and our cases support that concession. See Ingram, 446 F.3d at

9

1336 ("Delays exceeding one year are generally found to be presumptively prejudicial.") (quotations omitted). The delay also extended significantly beyond the minimum necessary to show presumptive prejudice. See Doggett, 505 U.S. at 652 (explaining that "the presumption that pretrial delay has prejudiced the accused intensifies over time"). This factor, therefore, weighs against the government.

## 2. The Reason for the Delay

The next factor we weigh is the reason for the ten-year delay. The government bears the burden of establishing valid reasons for the delay. See Ingram, 446 F.3d at 1337 ("[T]he burden is on the prosecution to explain the cause of the pre-trial delay.") (quotations omitted). We allocate different weight to different reasons for delay: (1) "[a] deliberate attempt to delay the trial in order to hamper the defense [is] weighted heavily against the government"; (2) "[a] more neutral reason such as negligence or overcrowded courts [is] weighted less heavily [against the government] but nevertheless [is] considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant"; and (3) "a valid reason, such as a missing witness, . . . serve[s] to justify appropriate delay." Barker, 407 U.S. at

10

531. A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay. See Ingram, 446 F.3d at 1337. But the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith. See id. at 1339-40.

The record adequately supports the district court's finding that Villarreal engaged in evasive tactics to impede the government's efforts to arrest him.[4] Almost immediately after the grand jury issued an indictment

---

[4] The district court made a factual finding that the government acted diligently in its efforts to arrest Villarreal and that Villarreal purposefully evaded law enforcement. We have articulated our standard for reviewing a district court's findings about whether the government acted diligently variously as review for "clear error" and review "with considerable deference." Compare Doggett, 505 U.S. at 652 ("[T]he Government claims to have sought Doggett with diligence. The findings of the courts below are to the contrary, however, and we review trial court determinations of negligence with considerable deference."); United States v. Clark, 83 F.3d 1350, 1352 (11th Cir. 1996) (per curiam) (reviewing "with considerable deference" the district court's determinations that the defendant was "within the considerable reach of the Government during" the post-indictment delay and that "the Government's failure to arrest [the defendant] was due entirely to negligence") (quotation added) (citing Doggett, 505 U.S. at 652); and United States v. James, 183 Fed. Appx. 923, 927 (11th Cir. 2006) (per curiam) (unpublished) ("We review the district court's determination of who is responsible for the delay with 'considerable deference'") (quoting Clark, 83 F.3d at 1352), with United States v. Bagga, 782 F.2d 1541, 1544 (11th Cir. 1986) ("We think that the record supports a finding that the government made a diligent good-faith effort to locate [the defendant], and, in any event, the findings below are not clearly erroneous."); United States v. Mitchell, 769 F.2d 1544, 1546-47 (11th Cir. 1985) (describing the Barker factors as "four facts" that a court must assess; further stating as follows: "The government initially contests the trial court's determination that the agents did not seriously attempt to find the defendants. . . . The district court's finding of fact cannot be disturbed unless clearly erroneous."); and United States v. Spaulding,

(continued...)

11

against Villarreal, three federal agents traveled to the Mission, Texas, area with an informant to investigate the informant's lead that Villarreal lived in the area. They surveilled three properties potentially connected to Villarreal, one of which Villarreal now claims to have resided in at the time the agents went to Mission.[5] But the government's informant, a cooperating defendant with an incentive to assist in Villarreal's arrest, received information that Villarreal had fled to the border-town of

<hr />

(...continued)

322 Fed. Appx. 942, 946 (11th Cir. 2009) (per curiam) (unpublished) (concluding, after discussing the district court's "finding" that the government's efforts to apprehend the defendant fell between diligence and bad faith and also discussing the various facts on which the government relied to make that finding, that the district court's findings are not "clearly erroneous"). Under either articulation of the standard of review, the result in this case would be the same.

[5] The record provides little detail on the extent of surveillance the agents conducted on these three addresses. At a minimum, the agents appear to have come into close proximity of the three locations and observed them for at least some unknown period of time. The agents, however, never attempted to make contact with anyone at these three locations. The combination of the agents' failure to make contact coupled with the agents' failure to explain adequately why they declined to make contact is troubling. Nonetheless, an agent not involved in the actual surveillance did testify that, as a general matter, agents probably would not attempt contact without knowing for certain that Villarreal visited these locations because that might scare him and lead him to cross the border, if he had not already done so. Moreover, the facts of this case are not like those in Doggett where if the investigators had made any "serious effort to test their progressively more questionable assumption that [the defendant] was living abroad, . . . they could have found him within minutes." 505 U.S. at 652-53. Here, the record adequately supports the district court's finding that Villarreal sought to evade police.

12

Reynosa, Mexico.[6]  Although these particular agents left the Mission area at this point, the marshal's office that covered the Mission area received a "Declaration of Fugitive" form no later than February 1999 that listed the charges against Villarreal, the addresses associated with him, as well as his height, weight, and associates.  And in 2005, agents followed up a lead on an address in the Mission area only to have the neighbors inform them that "they had not seen [Villarreal] in quite a while."  (R. v.2 Doc. 102 at 39.)

In addition to these ground-level investigations, the federal agents also used databases to pursue Villarreal.  The agents monitored the National Crime Information Center database and the Auto Track database for any information that could lead to Villarreal's arrest.  They checked these databases annually and also received alerts for any changes in the databases that could be connected to Villarreal.  These annual database checks and alerts would have revealed any efforts by Villarreal to change, renew, or obtain a social security card, immigration card, or driver's license as well as any changes to Villarreal's credit records.  And each

---

[6] We note that while the transcript from the evidentiary hearing refers to "Renosa, Mexico," we believe that it was intended to refer to Reynosa, Mexico.

time the federal agents received alerts potentially connected to Villarreal (e.g., when an alert notified the agents that a person detained elsewhere matched Villarreal's description), the agents appear to have followed those leads to their end, but none ever led to Villarreal. On top of using these nationwide databases, early in the investigation the federal agents made at least one affirmative inquiry with a Texas agency—and all signs indicated Villarreal was in Texas or Mexico—requesting any new addresses, photographs, or licensing information on Villarreal, but the inquiry produced no fruitful information. Finally, in 2005 the agents also placed a border patrol lookout for Villarreal that would trigger Villarreal's detention if immigration officials checked Villarreal's credentials at an official border entry point.[7]

---

[7] We have some concern about the federal agents' failure to post a border lookout for Villarreal until 2005 even though they suspected he had fled to Mexico but knew (or should have known) he still had close family in Mission, Texas. But the alert could have potentially led to an earlier apprehension of Villarreal only if he attempted to cross the border at an official location, and the record does not demonstrate that the government would have apprehended Villarreal earlier had it placed a border patrol alert for Villarreal immediately after the indictment. Although given the circumstances of this case we find it troubling that the government tarried in placing this alert, we are comforted by the testimony of a federal agent that the NCIC database searches would have picked up at least some immigration-related activities. And it was Villarreal's attempt to renew a resident alien card that triggered a flag that led to Villarreal's arrest. Moreover, there is no evidence in the record that, following his indictment, Villarreal entered the United States at an official border crossing; thus, an earlier border patrol

(continued...)

14

Although Villarreal complains that the government should have made more substantial efforts to locate him, the record supports the district court's finding that Villarreal stymied the government's efforts through evasion. The agents received seemingly reliable information that Villarreal had fled to Reynosa, Mexico, soon after law enforcement seized Villarreal's tractor-trailer in December 1997. The government attempted to notify Villarreal of the seizure and forfeiture proceedings, but received no response. Moreover, prior to the seizure of his truck, Villarreal had a driver's license and a credit card in his own name. Yet, the record does not contain any driver's license, tax, employment, utility, credit, immigration, or other records indicating Villarreal resided in Mission, Texas, after his indictment. And aside from his sister and nephew, no witnesses testified that Villarreal resided in Mission, Texas. Given that Villarreal claims to have resided and worked in Mission, Texas, from the time his truck was seized until at least 2004, the near-complete absence of records and witnesses to support that claim is telling. Finally, Villarreal's own evidence shows that Villarreal had moved to a Mexican border-town

(...continued)
alert may not have led to an earlier apprehension of Villarreal.

15

near Reynosa in 2004 or 2005 and that he resided there until his arrest in 2008 (though he made occasional visits to Mission, Texas). And, if he was residing in Mission, Texas, the absence of normal supporting records of that supports an inference that he was trying to hide from authorities. Based on this record, we cannot conclude that the district court clearly erred in finding that Villarreal purposefully evaded law enforcement by fleeing to Mexico and leading a paperless life.

Because Villarreal made substantial efforts to evade police, and that partially explains the failure to arrest Villarreal earlier, we weigh this factor in favor of the government. However, because we have noted some concerns about gaps in the government's efforts to locate Villarreal, we decline to give this factor very much weight.

### 3. Assertion of Right to a Speedy Trial

We next consider whether the defendant asserted his right to a speedy trial. See Barker, 407 U.S. at 528 (rejecting the rule that a defendant waives his speedy trial rights by failing to demand a speedy trial and incorporating "the defendant's assertion of or failure to assert his right to a speedy trial [as] one of the factors to be considered" in the balancing test). A defendant's assertion of his speedy trial right is often

16

"entitled to strong evidentiary weight in determining whether a defendant is being deprived of the right." Id. at 531-32. This is so because a timely demand for a speedy trial often supports an inference that the defendant was not at fault for the delay and that the delay prejudiced the defendant. See id. at 531 ("The strength of [the defendant's] efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences."). But the weight attached to a defendant's assertion of his speedy trial right will differ with the circumstances of the defendant's demand. See id. at 528-29 (explaining that a court may "attach a different weight" to different circumstances, such as frequent and forceful demands as compared to a "purely pro forma objection").

However, a . . . defendant's "failure to make a demand can hardly be counted against the defendant during those periods when he was unaware that charges had been lodged against him." 5 LaFave, Criminal Procedure, § 18.2(d); see also Doggett, 505 U.S. at 653-54 (finding that the defendant is "not to be taxed for invoking his speedy trial right only after his arrest" if he was unaware that he was under indictment or that

17

"the police had come looking for him"); Ingram, 446 F.3d at 1338 (weighing this factor "heavily against the Government" where the defendant asserted his right to a speedy trial soon after learning of the indictment and arrest warrant, but had failed to do so beforehand); United States v. Taylor, 306 Fed. Appx. 492, 493 (11th Cir. 2009) (unpublished) ("Where the defendant did not know of the indictment until his arrest, however, he may promptly assert his right to a speedy trial after arrest, and it weighs heavily against the government.") (citing Ingram, 446 F.3d at 1340).

Here, Villarreal claims he timely and forcefully asserted his right to a speedy trial once arrested. He argues he should not be taxed for his failure to assert the right before that time because he was unaware of the charges pending against him. The district court, however, rejected Villarreal's construction of the facts; it found that Villarreal knew, a short time after his July 1998 indictment, that the government was seeking to arrest and prosecute him for charges stemming from the Florida drug bust on his tractor-trailer. It further found that Villarreal failed to assert his right to a speedy trial until after his arrest in 2008. On appeal, Villarreal challenges only the district court's finding with respect to his knowledge

18

of the charges pending against him. However, we cannot conclude that the district court clearly erred with respect to that finding.

As the district court noted, much of the previous discussion regarding the reason for the delay applies with equal force to determining whether Villarreal knew of the charges pending against him. As discussed, we cannot find clear error in the district court's findings that Villarreal took steps to evade detection by law enforcement officials following the drug bust on his seized tractor-trailer and his subsequent indictment. Villarreal's efforts to evade law enforcement undermine his claim that he was unaware of the charges pending against him and provide an adequate basis for the district court to infer Villarreal knew of the charges pending against him around the time the indictment issued.[8]

---

[8] The district court also relied on the government's efforts up to October 1998 to notify Villarreal that his truck was seized. Villarreal argues that the district court's reliance on this notice requires us to find clear error because (1) the government presented no evidence that Villarreal received the notice, (2) Villarreal presented evidence that he had no ownership interest in the tractor-trailer that would have led him to respond to the seizure and forfeiture notice even if he received it, and (3) a notice of seizure and forfeiture of a tractor-trailer would not adequately put Villarreal on notice of criminal charges pending against him even if he had received the notice. Although this notification was a factor in the district court's calculus, it was not the lone factor relied upon by the district court. Thus, we need not address whether this factor standing alone would suffice to sustain the district court's finding that Villarreal was aware of the charges. In fact, Villarreal's evasive tactics alone suffice to sustain the district court's finding as not clearly erroneous.

19

Because we cannot conclude the district court clearly erred in finding Villarreal knew of the charges against him but failed to demand a speedy trial during the nearly ten-year delay from his indictment to his arrest, this factor weighs heavily against Villarreal. Villarreal's failure to assert his right in any manner until after his arrest will make "it difficult for [him] to prove that he was denied a speedy trial." Barker, 407 U.S. at 532.

### 4. Actual Prejudice

The final factor we examine is the extent to which the defendant suffered actual prejudice from the delay. If, as here, the first three factors do not weigh heavily against the government, the defendant generally must demonstrate actual prejudice to succeed on his speedy trial claim. See United States v. Dunn, 345 F.3d 1285, 1296 (11th Cir. 2003) ("'[I]n this circuit, a defendant generally must show actual prejudice unless the first three factors . . . all weigh heavily against the government.'") (quoting United States v. Register, 182 F.3d 820, 827 (11th Cir. 1999)). We assess the prejudice suffered by the defendant in light of the three interests of the defendant the speedy trial right was intended to protect: (1) "to prevent oppressive pretrial incarceration;" (2) "to minimize anxiety

and concern of the accused;" and (3) "to limit the possibility that the defense will be impaired."  Barker, 407 U.S. at 532.  "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Id.

Villarreal first argues that he should not have to show actual prejudice because of the lengthy delay between his indictment and trial. We agree that an approximately ten-year delay is extraordinary and gives rise to a stronger presumption of prejudice than a one-year delay.  See Doggett, 505 U.S. at 652 (explaining that the "presumption that pretrial delay has prejudiced the accused intensifies over time").  But the strength of that presumption is severely undermined, if not completely eliminated, when the defendant himself causes the delay through evasive tactics and is aware of the charges against him but fails to assert his right to a speedy trial.[9]  Far from suffering prejudice, these facts suggest the defendant actually benefitted from the delay because a defendant suffering prejudice is unlikely to exacerbate his delay through evasive tactics or fail to assert his right to a speedy trial.  And it is in part for this reason that, "in this

---

[9] That, of course, was the essence of the factual findings made by the district court and, as stated previously, we accept those findings because we do not conclude that such findings constituted clear error.

21

circuit, a defendant generally must show actual prejudice unless the first three factors all weigh heavily against the government." Dunn, 345 F.3d at 1296 (quotations, alterations omitted).

Nonetheless, in considering whether Villarreal suffered actual prejudice, we remain mindful that the passage of time makes it more difficult to demonstrate actual prejudice with complete precision. See Barker, 407 U.S. at 532 (explaining that "[l]oss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown"); Doggett, 505 U.S. at 655 ("Barker explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'") (quoting Barker, 407 U.S. at 532).[10]

---

[10] Even if we were to view the presumption of prejudice against Villarreal as retaining its strength in spite of the other factors weighing against him, we would still conclude the government had not deprived him of his right to a speedy trial. A strong presumption of prejudice does not necessitate a finding of a speedy trial violation; rather, it serves as one factor, albeit an important factor, in our balancing. See Doggett, 505 U.S. at 655-56 ("While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay.") (citation omitted). Here, the record suffices to show Villarreal sought to evade police, Villarreal knew of the charges against him but failed until his arrest to demand a speedy trial, and the government suffered actual prejudice; thus, a balancing under those circumstances, even taking into account a strong presumption of prejudice, would still lead us to conclude the government did not deprive Villarreal of his right to a speedy trial.

22

Villarreal next argues that the district court clearly erred in its factual findings on actual prejudice—namely, that the government suffered actual prejudice while he suffered none. We cannot find clear error with these findings. The record establishes that the three individuals arrested in connection with the Florida drug bust—Jesus Rodriguez Diaz, Mario Ruiz, and Israel Cantu—all implicated Villarreal. Because of the delay caused by Villarreal's evasive tactics, however, none of these witnesses were available to testify against Villarreal: Diaz had been deported, Ruiz died, and Cantu could not be located. This evidence supports the district court's finding that the government suffered actual prejudice from the delay.

In contrast, Villarreal's evidence of actual prejudice was sufficiently weak that we cannot conclude the district court clearly erred in finding he suffered no prejudice. Villarreal argues that he was "unable to locate witnesses to prove that he operated legitimate businesses." (Aplt. Br. at 39.) Yet, Villarreal identified only a single specific witness, Pablo Moya, who his sister could not locate and who would have testified about Villarreal's legitimate business operations. Because Villarreal claims to have resided and worked in Mission for several years, the district court

23

had reason to be skeptical of Villarreal's ability to identify only a single witness who could corroborate his story yet could not testify at trial because of the delay. Further, even if Villarreal was operating a legitimate business, that is only a tangential fact, rather than a dispositive one, pertaining to the charge against Villarreal that he was engaged in drug dealing.

Villarreal further complains that he was "unable to locate numerous records (business, cell phone, residence, credit card, truck sale) due to the passage of nearly ten years." (Id.) As to the cell phone and credit card records, Villarreal's sister testified that she could only find the few credit card records that Villarreal offered to prove he resided in Mission during the delay, but that she could not locate any other documents. Apparently, neither Villarreal nor his counsel took any other steps to locate these purportedly exculpatory documents, such as contacting the cell phone or credit card companies. This lack of effort to locate these documents suggests they were not as exculpatory as Villarreal now claims. And again, there is no showing of the relevance of these records on Villarreal's ability to defendant himself against the drug distribution crimes charged in the indictment.

The key exculpatory document that Villarreal claims to have lost, however, is a document purporting to show that he sold the tractor-trailer seized in the Florida drug bust prior to the bust. Villarreal's sister testified that she could not find any documents recording the sale, but testified that Villarreal's wife informed her that Villarreal sold the tractor-trailer a few months prior to the Florida drug bust. Villarreal offered no explanation for his failure to subpoena his wife to testify and bring any relevant documents regarding the tractor-trailer.[11] Moreover, law enforcement did recover a document showing that Villarreal had, in fact, leased the tractor-trailer to another individual, and one could infer that Villarreal's wife was referring to this lease agreement as opposed to an outright sale. These circumstances sufficiently support the district court's fact finding in spite of the sister's testimony regarding the tractor-trailer.

In sum, we find no clear error in the district court's finding that the government suffered substantial prejudice from the delay caused by Villarreal while Villarreal suffered no actual prejudice. Therefore, this factor weighs heavily against Villarreal.

---

[11] The lack of effort to secure the testimony of Villarreal's wife is particularly telling since she could have also confirmed Villarreal's claim that he resided with her in Mission, Texas, until their estrangement in 2004 or 2005.

### 5. Speedy Trial Conclusion

We must now balance these four factors. The first factor weighs in favor of Villarreal. The second factor weighs against Villarreal because he attempted to evade police, though our concerns about the gaps in the government's efforts to arrest Villarreal prevent us from weighing this factor against him heavily. The third factor weighs heavily against him as does the fourth factor. Our balancing of these factors leads us to agree with the district court that the government did not deprive Villarreal of his right to a speedy trial. This conclusion is bolstered by the fact that, in this circuit, a defendant such as Villarreal generally must show actual prejudice where the first three factors do not weigh heavily against the government. Dunn, 345 F.3d at 1296.

## II. Sentencing

Villarreal next challenges both the procedural and substantive reasonableness of his sentence. Villarreal challenges three aspects of the district court's calculation of his sentencing range: (1) its attribution to him of more than 10,000 kilograms of marijuana; (2) its finding that he possessed a firearm during the offense; and (3) its finding that Villarreal was an organizer of the offense. As to the substantive reasonableness of

26

his sentence, Villarreal argues that the 328-month sentence was unduly harsh and devoid of justification. We find no merit in any of Villarreal's challenges to his sentence.

## A. STANDARD OF REVIEW

"We review a criminal sentence for procedural and substantive reasonableness under an abuse of discretion standard." United States v. Livesay, 587 F.3d 1274, 1278 (11th Cir. 2009). "We review for clear error the district court's factual findings related to the imposition of sentencing enhancements." United States v. Robertson, 493 F.3d 1322, 1329 (11th Cir. 2007) (quotation omitted). A district court's factual finding is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quotation omitted.) And credibility determinations are the province of the district court. See McPhee, 336 F.3d at 1275.

## B. ANALYSIS

### 1. Procedural Reasonableness

#### a. Quantity of drugs attributable to Villarreal

The district court made a factual finding that more than 10,000 kilograms of marijuana were attributable to Villarreal, which led to a base offense level of 36. See U.S.S.G. § 2D1.1(c)(2). Villarreal claims the actual amount attributable to him is 3,000 to 6,000 kilograms and the district court's finding was based on speculative, uncorroborated testimony, the reliability of which was further undermined by the delay in Villarreal's prosecution. But we find no clear error in the district court's factual finding.

Taken together, the testimony of three witnesses adequately supports the district court's finding. Dale Smith, who purchased his marijuana from Villarreal, testified that Villarreal distributed between 8,000 and 10,000 pounds (~3,636 to 4,545 kilograms) of marijuana per year from 1992 to 1997. Gerald Ward, a fellow drug dealer, testified that he received around 20,000 pounds (~9,090 kilograms) of marijuana from Villarreal  And Cristobal Salinas Santos testified that he delivered about 1,200 to 4,000 pounds (~545 to 1,818 kilograms) of marijuana per month to Villarreal from 1993 to 1996. Villarreal emphasizes that these numbers are moderately inconsistent, but the cumulative testimony of these

28

witnesses does not leave us with a firm conviction that the district court made a mistake in attributing 10,000 kilograms of marijuana to Villarreal.

### b.    Villarreal's leadership role

Villarreal next challenges the district court's factual finding that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," which resulted in a four-level increase in Villarreal's offense level.  See U.S.S.G. § 3B1.1(a).  On appeal, Villarreal challenges only the district court's finding regarding his leadership role, not the number of participants involved in the criminal activity.  Villarreal failed to challenge before the district court the finding regarding his leadership role, and we review objections not raised in the district court for plain error.  See United States v. Gonzalez, 550 F.3d 1319, 1322 (11th Cir. 2008) (per curiam).  In any case, we would uphold the district court's factual finding whether we employed a plain error or abuse of discretion standard of review because we find no clear error in the district court's fact finding.

The record adequately supports the district court's finding of Villarreal's leadership role.  A criminal conspiracy may include multiple leaders.  See U.S.S.G. § 3B1.1, Commentary, App. Notes n.4.  To qualify

as an organizer or leader for purposes of U.S.S.G. § 3B.1.1(a)'s enhancement, the defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, Commentary, App. Notes n.2. And a "participant" includes any "person who is criminally responsible for the commission of the offense," irrespective of whether the person has been convicted." Id. n.1. Here, one of Villarreal's marijuana customers, Dale Smith, testified regarding debt collectors Villarreal directed to obtain drug-debt payments from him. Although Smith could only testify that it was "understood" that Villarreal sent the collectors (Id. at 77), the circumstances of the debt collection—namely, that Smith had purchased marijuana from Villarreal and owed a drug debt to Villarreal—support an inference that Villarreal sent these individuals to collect Smith's debt for him. In fact, Smith recognized one of the collectors from a previous occasion when he purchased marijuana from Villarreal. Thus, the district court had a sufficient basis for finding Villarreal managed other participants, and, therefore, served in a leadership role.

### c. Possession of a firearm by Villarreal

30

Villarreal further challenges the district court's factual finding that he possessed a dangerous weapon—a firearm—in connection with the offense, which increased his offense level by two points. See U.S.S.G. § 2D1.1(b)(1). Again, Villarreal's argument against the district court's finding is that the testimony of the witnesses was uncorroborated and not credible. But we again find no clear error.

Here, there is evidence to support a finding that Villarreal constructively possessed a firearm. A defendant's possession of a firearm can be shown by demonstrating he actually possessed the firearm or that he constructively possessed it, which means he had "ownership, dominion, or control over an object itself or control over the premises in which the object is concealed." United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005) (quotation omitted). In this case, Santos Salinas, a fellow drug dealer, attested to the presence of two semiautomatic firearms on a table in a marijuana stash house "controlled" by Villarreal. (R. v.2 Doc. 103 at 12-14.) This testimony supports the district court's finding that Villarreal possessed a firearm, and Villarreal's mere complaint that this testimony is "uncorroborated" does not lead us to find clear error.

31

Moreover, there is evidence to support a finding that Villarreal's co-conspirator possessed a firearm that could be attributed to Villarreal. A co-conspirator's possession of a firearm may be attributed to the defendant for purposes of this enhancement if his possession of the firearm was reasonably foreseeable by the defendant, occurred while he was a member of the conspiracy, and was in furtherance of the conspiracy. United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999). Here, Dale Smith, one of Villarreal's marijuana customers, testified that Villarreal had "sent some guys up to take collections" for debts he owed. (R. v.2 Doc. 103 at 66.) Smith further testified that these collectors would carry "firearms" or "a gun." (Id. at 67-68.) This testimony suffices to attribute the collectors' firearms to Villarreal because Villarreal could have reasonably foreseen that his drug-debt collectors would use a firearm to collect payment in furtherance of the drug distribution conspiracy.

## 2. Substantive Reasonableness

Finally, Villarreal challenges the substantive reasonableness of his 328-month sentence because he views it as excessively harsh, devoid of explanation, and issued without sufficient consideration of mitigating factors like his minimal criminal history. However, the district court's

sentence fell in the middle of the advisory guidelines range, and we generally expect such a sentence to be substantively reasonable. See United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect a sentence within the Guidelines range to be reasonable.") (quotation and alteration omitted). And Villarreal's criminal history was not completely disregarded because Villarreal's criminal history category reflects his minimal criminal history. Moreover, Villarreal pled guilty to conspiring to distribute drugs, and the district court found that the drug distribution involved large quantities of marijuana and that Villarreal was a leader of the distribution scheme. Under these circumstances, we cannot conclude that the district court abused its discretion in imposing a 328-month sentence.

## CONCLUSION

For the reasons discussed above, we affirm the district court's denial of Villarreal's motion for a dismissal of the indictment on grounds that the government violated his speedy trial rights. We also affirm the district court's sentence in all respects.

AFFIRMED