[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15310
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20740-WPD-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAUL FREDERICK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 24, 2019)

Before TJOFLAT, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Saul Frederick appeals his convictions for conspiracy to defraud the government, in violation of 18 U.S.C. § 286, and aggravated identity theft, in

violation of 18 U.S.C. § 1028A.  Frederick argues that the district court erred by denying his motion to dismiss his indictment on Sixth Amendment speedy-trial grounds due to a six-year pretrial delay.  After careful review, and for the reasons that follow, we affirm Frederick's convictions.

## I.

On September 28, 2012, a federal grand jury returned an indictment charging Frederick and five codefendants with fraud and identity-theft offenses arising out of an income-tax-return scheme being operated out of H&A Tax Multi-Services in Miami-Dade County, Florida.  By that time, Frederick had left the United States for Haiti, where he remained until his arrest on July 17, 2018.  After his arrest, Frederick moved to dismiss the indictment, arguing that the government caused the nearly six-year delay, in violation of his Sixth Amendment right to a speedy trial, by failing to take reasonable steps to apprehend him after the indictment issued.  The district court held an evidentiary hearing and then denied the motion.

## A.

At the September 2018 evidentiary hearing, the government called as witnesses codefendant Frantz Charles, Internal Revenue Service ("IRS") Special Agent Jon Skinner, and Deputy United States Marshal Bryan Bailey.  The parties also stipulated to the admission of various exhibits.

2

The testimony and exhibits established the following. Within a few months after the indictment issued, the government had arrested several codefendants, including Charles and Frandy Prophete. But it was unable to locate Frederick and two others, so it transferred them to fugitive status on November 29, 2012. Frederick's case was referred to the U.S. Marshal's Service, which is charged with locating fugitives in the United States and abroad. It does not appear that the Marshal's Service took any action until June 2018, however. Instead, Skinner, the lead investigator for the IRS, took primary responsibility for locating Frederick.

During debriefings with Charles in November 2012 and Prophete in January and April 2013, Skinner learned that Frederick had moved to Haiti a few months before the indictment issued. Frederick is a U.S. citizen with family and connections in Haiti. Charles testified that Frederick knew about the criminal investigation into H&A Tax when he left the United States—owing to the arrest of an associate and the execution of a search warrant at H&A Tax in March 2011—and specifically told Charles "they coming" in reference to federal law enforcement. Frederick also mentioned waiting out the statute of limitations, according to Charles.

In March 2013, the prosecutor assigned to the case contacted the Department of Justice and spoke with someone familiar with legal matters concerning Haiti. Around this time, according to Skinner, it was extremely difficult to get people out of Haiti due to the "government situation following the earthquake" in 2010. So

3

there "wasn't really a big push" to find Frederick because "no fugitives were being extradited or sent out of Haiti at the time."

In the years following the indictment, the government attempted to track down information about Frederick by speaking with his family members and associates, obtaining records, and searching databases and social media. Skinner spoke with Frederick's brother in 2012 and 2014 and received a cell-phone number for Frederick. Skinner then obtained phone records for that number to try to find additional leads. Skinner identified Frederick's prior employers and obtained wage and hour reports for Frederick and some of his family members and associates. Skinner also obtained Frederick's international travel records, which showed that Frederick did not use his U.S. passport for travel after October 2012 until his arrest, despite relatively frequent international travel in the preceding six-year period. Meanwhile, from 2013 through 2017, the U.S. Secret Service periodically searched social media and various databases[1] for information about Frederick.

In addition to these investigative efforts, Skinner asked the State Department to revoke Frederick's U.S. passport in 2015, though he never heard back about that

---

[1] These databases included the National Law Enforcement Telecommunications System (NLETS), the National Crime Information Center (NCIC), the Florida Department of Motor Vehicles' Driver and Vehicle Information Database (DAVID), the Secret Service Master Central Index (MCI), and two privately-contracted databases (FINDER and TLO).

request. Then, around a year later, Skinner submitted a request to Interpol[2] to issue a "Red Notice"—effectively an international arrest warrant—for Frederick's arrest. Interpol issued the Red Notice in mid-2016.

In or around March 2017, codefendant Charles, who had pled guilty and was sentenced to a total term of 61 months, was released from prison and began his term of supervised release. Charles testified that, soon after his release, he communicated with Frederick regularly by phone and advised him to return to the United States to plead guilty to his crimes and move on with his life. Later that same year, the government located and secured the arrest of codefendant Hugues Jean Noel in Haiti. Noel refused to cooperate with the government in locating Frederick.

The government obtained no new information about Frederick's location until June 2018. That month, Skinner returned to one of Frederick's former residences in the United States to speak to family members and possible associates. One of the individuals he spoke with stated that Frederick was working for the Haitian national television company and that his family was from a town outside Port-au-Prince. Skinner provided this new information to the Marshal's Service. The Marshal's Service coordinated with members of the Haitian National Police and were able to secure Frederick's arrest on July 17, 2018.

---

[2] "Interpol is the common name of the International Criminal Police Organization, a 190-country intergovernmental organization that facilitates international police cooperation." *Lehman v. Lucom*, 727 F.3d 1326, 1329 (11th Cir. 2013) (quotation marks omitted).

Though not directly relevant to its efforts to locate Frederick, the government submitted a Facebook post that identified Frederick as "M. Saul Bitar," suggesting that Frederick had changed his name to avoid detection. For his part, Frederick submitted a variety of documents showing that he used the name "Saul Frederick" to conduct affairs in Haiti. These documents included car registration and insurance materials and a letter from the Administrative Office of Haitian National Television, where Frederick was employed. When Skinner was asked why he did not attempt to search Haitian records for Frederick's name, Skinner explained that records checks in Haiti would need to go through an attaché, but he did not do that.

**B.**

Following the hearing, the district court entered an order denying Frederick's motion to dismiss the indictment. The court weighed the four factors set out in *Barker v. Wingo*, 407 U.S. 514 (1972), and concluded that the government had not deprived Frederick of his right to a speedy trial. In doing so, the court determined the following: (1) the delay was sufficient to trigger a speedy-trial inquiry; (2) the government did not deliberately delay Frederick's arrest and acted in good faith and with "some diligence"; (3) Frederick delayed invoking his speedy-trial rights; and (4) there was no actual prejudice, as the parties had stipulated before the hearing. Because the first three factors did not weigh heavily against the government and

6

there was no actual prejudice, the court concluded that the circumstances did not warrant "the extraordinary remedy of dismissing this indictment."

Frederick then pled guilty to two counts of the indictment under a written plea agreement, reserving the right to challenge the denial of his motion to dismiss the indictment. The district court sentenced him to a total term of 61 months. Frederick now appeals the denial of his motion to dismiss the indictment.

## II.

Whether a defendant was deprived of his Sixth Amendment right to a speedy trial presents a mixed question of law and fact. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010). We review a district court's legal conclusions *de novo* and its factual findings for clear error. *Id.* A factual finding is clearly erroneous only if we are left with a definite and firm conviction that the court made a mistake. *Id.* Moreover, we allot substantial deference to the factfinder in reaching credibility determinations regarding witness testimony. *Id.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "In light of the unique policies underlying the speedy trial right, courts must set aside any judgment of conviction, vacate any sentence imposed, and dismiss the indictment if the right is violated." *United States v. Oliva*, 909 F.3d 1292, 1297 (11th Cir. 2018) (quotation marks omitted).

We analyze speedy-trial claims under the four-factor balancing test articulated in *Barker*, considering the (1) length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy-trial right, and (4) actual prejudice to the defendant. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006). "The first factor, length of the delay, serves a triggering function: it must first be satisfied for the court to analyze the other factors." *Oliva*, 909 F.3d at 1298. Both parties agree that the nearly six-year delay in this case is sufficient to show presumptive prejudice and trigger analysis of the other factors. *See id.* ("A post-indictment delay exceeding one year is generally sufficient to trigger the analysis."); *Ingram*, 446 F.3d at 1336 ("Delays exceeding one year are generally found to be 'presumptively prejudicial.'"). But "[p]resumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett v. United States*, 505 U.S. 647, 655 (1992).

Frederick had stipulated before the hearing that he could not prove actual prejudice. So for him "to succeed in showing a violation of his right to a speedy trial" without particularized prejudice, the first three factors all must weigh heavily against the government. *Ingram*, 446 F.3d at 1336 (citing *Doggett*, 505 U.S. at 657). We assume that the nearly six-year delay between indictment and arrest weighs heavily against the government. Frederick's motion to dismiss, therefore, depends

8

on the second and third factors, which the district court found did not weigh heavily against the government.  We discuss each factor in turn.

## A.

As to the second *Barker* factor, the government bears the burden of establishing valid reasons for the delay.  *Villarreal*, 613 F.3d at 1351.  Different reasons for delay are accorded different weights in the analysis.  *Oliva*, 909 F.3d at 1301.  Intentional delay by the government for the purpose of hindering the defense weighs heavily against the government.  *Id.*  By contrast, a valid reason, such as a missing witness or a defendant's evasive tactics, justifies reasonable delay.  *Id.*; *Villarreal*, 613 F.3d at 1351 ("A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay.").

Negligence falls somewhere in between.  "It is more neutral and should be weighted less heavily than bad-faith acts."  *Oliva*, 909 F.3d at 1301 (quotation marks omitted).  But negligence is still considered an "unacceptable" reason for delay for which responsibility ultimately rests with the government.  *Id.* at 1301–02.  And we become less tolerant of delay caused by negligence the longer it lasts.  *Id.* at 1302.  "Analyzing the second factor, therefore, overlaps some with the first:  the length of the delay impacts our determination of whether the [g]overnment's negligence weighs heavily against it."  *Id.*

9

In cases where the defendant is missing, "the government is not required to exhaust all conceivable avenues in finding him or her." *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018) (quotation marks omitted). But "it has a constitutional duty to make a diligent, good-faith effort to locate and apprehend a defendant and bring the defendant to trial." *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986). "[T]he government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." *Villarreal*, 613 F.3d at 1351.

Our decision in *Bagga* is instructive. In *Bagga*, the defendant was indicted in absentia after he left for India to care for his ill wife. 782 F.2d at 1542. Upon returning to the United States nearly six years later, the defendant turned himself in and moved to dismiss the indictment on speedy-trial grounds. *Id.* The district court denied the motion to dismiss after an evidentiary hearing. The evidence showed that law enforcement sought information from local police authorities, registered the defendant in a national crime information network, attempted to locate him at his last-known address and at a restaurant owned by his family, and took steps to apprehend him if and when he sought to return to the United States. *Id.* at 1543–44.

On appeal, the defendant claimed that the government's investigation was insufficient because there was no notice placed on his passport, no attempt to extradite him after law enforcement learned he was in India, and no attempt to

10

contact individuals or entities who might have known his exact address in India. *Id.* at 1543. We affirmed the denial of the defendant's motion. *Id.* We found that the defendant's contentions regarding the passport carried "the obligation of a diligent good-faith effort too far," and that the government was not required to attempt "futile legal gestures" or pursue every lead on the "off-chance" that someone may have knowledge of the defendant's exact address abroad. *Id.* at 1543–44. At best, we said, the government's failure to locate the defendant in India was "no more than mere negligence." *Id.* at 1544. And we concluded that any negligence should not weigh heavily against the government because it engaged in a good-faith effort to locate the defendant and "the defendant was at liberty and outside the jurisdiction where the indictment was returned." *Id.*

Similarly, in *Machado*, the defendant was indicted several months after he left the United States for Brazil. 886 F.3d at 1081. Despite returning to the United States several times between 2010 and 2014, the defendant was not arrested until 2016, after which he moved to dismiss the indictment on speedy-trial grounds. *Id.* The district court denied the motion, and we affirmed. We concluded that the government's efforts to locate the defendant were carried out in good faith and with due diligence, where the government had attempted to arrest the defendant at his last-known address, had visited his former church, and then, after learning that the defendant may have moved to Brazil, had placed the defendant's arrest warrant for

11

interception in the National Crime Information Center system and conducted "periodic searches for indicia of Machado's continued presence in the United States." *Id.* Further, we rejected the defendant's claim that the government was required to seek his extradition, noting that the extradition treaty did not require extradition of Brazilian nationals like the defendant. *Id.* n.10.

Here, the district court did not err in finding that the second factor did not weigh heavily against the government. There is no evidence that the delay was attributable to any bad faith on the part of the government. On the other hand, we also do not conclude that the delay was completely justified by Frederick's evasive tactics. While there is some suggestion that Frederick left the United States due to the criminal investigation and then used another name to avoid detection, the evidence on this matter was equivocal, and the court made no express finding of justifiable delay.

Nevertheless, the district court's finding that the government sought Frederick with "some diligence" and in good faith and that its negligence was "slight" is amply supported by the record. *See Doggett*, 505 U.S. at 652 ("[W]e review trial court determinations of negligence with considerable deference."). Frederick is incorrect that the government failed to make any meaningful effort to locate him until June 2018. In trying to locate Frederick, Skinner and the government went to Frederick's prior residences; spoke with Frederick's codefendants, family members, and

12

associates; obtained phone records, wage and hour reports, and travel records; attempted to revoke his passport; regularly checked various databases and social media; and caused an Interpol Red Notice to issue for Frederick's arrest. Contrary to Frederick's claim, these efforts were clearly more than "minimal" and are similar to, if not greater than, the investigative efforts we found reasonably diligent in *Bagga* and *Machado*. In fact, it was through these efforts that Skinner eventually obtained the information that led to Frederick's arrest in Haiti.

Frederick faults the government for limiting its efforts mainly to the United States, when it knew that Frederick was in Haiti. He says that it would have been "extremely easy" to locate him in Haiti by using his full name "Saul Frederick" in "easily identifiable databases," and that the government's contention that it would have been difficult to locate or extradite him was "purely speculative."

But "the government is not required to exhaust all conceivable avenues in finding him or her." *Machado*, 886 F.3d at 1080. And Frederick offered no evidence about where he obtained the Haitian records that were submitted to the district court, the ease with which those records could have been obtained, or whether there were other individuals in Haiti with the name "Saul Frederick." Without additional information about these records, we cannot fault the government for failing to obtain these or similar records.

13

In any case, the government's failure to contact Haitian authorities for assistance in locating Frederick in Haiti was "no more than mere negligence," similar to the government's failure to obtain the defendant's address in India in *Bagga. See Bagga*, 782 F.2d at 1544. Nor was it negligence that must be weighed heavily against the government, since the district court found that the government's negligence was only "slight" and that it attempted to locate Frederick in good faith. *See Machado*, 886 F.3d at 1081 n.11 ("[B]ecause the government at a minimum acted in good faith, any alleged failure to more diligently pursue Machado should not weigh heavily against the government."). For the reasons explained above, those findings are not clearly erroneous. *See Doggett*, 505 U.S. at 652. Finally, although the length of the delay in this case was long, it was comparable in length to the delays found permissible in *Machado* and *Bagga,* and as in *Bagga* "the defendant was at liberty and outside the jurisdiction where the indictment was returned." *Bagga*, 782 F.2d at 1544.

For these reasons, the district court did not err in concluding that the government's negligence weighed only "slightly," not heavily, against it. We agree with the court that "[t]he [g]overnment's good-faith attempt to arrest [Frederick] was diligent enough to avoid warranting the 'extraordinary remedy' of dismissing [his] indictment[]." *Oliva*, 909 F.3d at 1306.

**B.**

14

The third factor concerns "the defendant's responsibility to assert his right" to a speedy trial. *Barker*, 407 U.S. at 531. "Whether and how a defendant asserts his right is closely related to the other factors we have mentioned," as defendants are more likely to complain of more serious deprivations. *Id.* Therefore, a defendant's assertion of his speedy-trial right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531–32. On the other hand, a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532. Nevertheless, a defendant's failure to assert his rights cannot be counted against him if he was unaware of the charges against him. *Villarreal*, 613 F.3d at 1354.

Here, the third factor does not weigh heavily against the government. According to Charles's testimony, Frederick knew of the charges as of March 2017, more than a year before his arrest in July 2018. Yet he did not assert his speedy-trial rights until August 30, 2018. Frederick's delayed invocation of his speedy-trial rights makes it more difficult for him "to prove that he was denied a speedy trial," *Barker*, 407 U.S. at 532, even if it does not completely prevent him from doing so. In other words, this factor does not weigh heavily in favor of Frederick or against the government. To the extent Frederick challenges Charles's credibility, Frederick offers no persuasive reason to disturb the court's credibility determination. *See Villarreal*, 613 F.3d at 1349.

### III.

In sum, the district court did not err in finding that the first three *Barker* factors do not uniformly weigh heavily against the government.  For that reason, Frederick was required to demonstrate actual prejudice, which he stipulated that he could not prove.  *See Ingram*, 446 F.3d at 1336.  Accordingly, the district court did not err in denying Frederick's motion to dismiss the indictment on speedy-trial grounds.  We affirm Frederick's convictions.

**AFFIRMED.**

16