[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-10866
_____

D. C. Docket No. 02-80189-CR-DTKH

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
APRIL 25, 2006
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY DARNELL INGRAM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(April 25, 2006)**

Before BLACK, BARKETT and COX, Circuit Judges.

COX, Circuit Judge:

Larry Darnell Ingram appeals his convictions for making false statements in connection with the attempted purchase of a firearm. He argues that the district court

erred in denying his motion to dismiss the indictment on the grounds that a two-year delay between indictment and trial deprived him of his Sixth Amendment right to a speedy trial. We reverse the conviction and remand with instructions to dismiss the indictment.

## I. BACKGROUND & PROCEDURAL HISTORY

On February 28, 2000, Ingram, a convicted felon, attempted to purchase a firearm from Scott Mandel, owner of Greenacres City Pawn Shop. In doing so, he completed and signed Bureau of Alcohol, Tobacco, and Firearms (ATF) Form 4473, answering "no" to Question 9-C, "Have you been convicted in any court of a crime for which the judge could have imprisoned you for more than one year even if the judge actually gave you a shorter sentence?" In fact, Ingram had been convicted of several felonies, including grand theft, burglary and possession of cocaine.

When Mandel submitted Ingram's ATF Form 4473 to the National Instant Criminal Background Check System, the request to purchase the weapon was denied. As a result, in March 2000, ATF Special Agent Jeffrey Kunz began investigating the transaction. As a part of his investigation, Kunz interviewed Mandel. Mandel told Kunz that Ingram had admitted to Mandel that he had prior convictions but said that he was eligible to buy a gun because his civil rights had been restored. Mandel also told Kunz that Ingram had trouble with the form, actually filling it out more than

2

once, and that Ingram had asked questions about Question 9-C. Mandel said that, in response to Ingram's questions, Mandel and Ingram had reviewed the exception on the back of the form.[1]

Kunz's review of Ingram's criminal records revealed that, while Ingram's civil rights had been restored in March 1990 for all felony convictions prior to that date, the restored rights did not include the right to possess a firearm. Also, Ingram had been convicted of two more felonies after his civil rights had been restored.

In July 2000, Kunz interviewed Ingram at his place of employment. Ingram admitted that he was a convicted felon and that he had signed the form answering "no" to Question 9-C; he told Kunz that his civil rights had been restored and that his convictions that were more than ten years old did not count. Ingram also gave Kunz his home and cell phone numbers and the address of his home (which he owned); and he told Kunz that his brother was a police officer with the City of Fort Lauderdale.

---

[1]The back of Form 4473 says:

> For one who has been convicted of a crime for which the judge could have imprisoned the individual for more than one year . . . the prohibition does not apply if, under the law where the conviction occurred, the individual has been pardoned for the crime, or the conviction has been expunged or set aside, or the person has had civil rights restored, AND the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing any firearms. Persons subject to one of these exceptions should answer "NO" to questions 9c or 9k, as applicable.

3

Kunz turned his investigative report over to the U.S. Attorney's office in the summer of 2000 but did not hear anything else about it for over two years. When he checked with the U.S. Attorney's office in 2002, Kunz was told that the case had been "misplaced" there.

On October 25, 2002, over two and one-half years after the incident at the pawn shop, Ingram was indicted for violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), making false statements to a firearms dealer in connection with an attempted acquisition of a firearm. On the same day the indictment issued, it was sealed and a warrant was issued for Ingram's arrest. The indictment was unsealed nine months later, on July 31, 2003.

Between October 2002 and July 2004, ATF Agent Kunz made some minimal efforts to contact Ingram. Kunz left telephone messages for Ingram to call him and went to Ingram's residence once. At the residence, an unidentified person outside informed Kunz that Ingram had moved. Ingram returned at least one of Kunz's telephone messages (on December 13, 2002), leaving his cell phone number and his employer's address for Kunz to contact him. After that, Kunz was unable to reach Ingram by telephone. Kunz drove by Ingram's residence and place of work on several occasions but, not seeing Ingram, never got out of the car. On July 27, 2004, Kunz called Ingram at his place of employment and spoke to someone else who gave Kunz

another number to call to speak to Ingram; Kunz left a message at this new number, and Ingram returned his call on July 28, 2004.

At no time prior to July 28, 2004, did Kunz communicate to Ingram that Ingram had been indicted or that there was a warrant for his arrest. There is no evidence that Ingram knew of the indictment prior to July 28, 2004, when he was finally told of it by Agent Kunz. During the July 28, 2004 conversation, Ingram agreed to surrender in court on August 3, 2004.

On September 30, 2004, Ingram moved to dismiss the indictment because of pre- and post-indictment delay. A superceding two-count indictment was returned on October 15, 2004. Count 1 alleged violation of 18 U.S.C. § 924(a)(1)(A); Count 2 alleged violation of 18 U.S.C. § 1001(a)(2). Both counts alleged that Ingram had made false statements on ATF Form 4473. Ingram responded to the superceding indictment by moving to dismiss on the same grounds asserted in his first motion. On November 1, 2004, a magistrate judge conducted an evidentiary hearing on Ingram's motion to dismiss the indictment. The magistrate judge recommended denial of the motion. The district court adopted the report and recommendations of the magistrate judge in their entirety and denied Ingram's motion to dismiss.

Trial on the superceding indictment was commenced on November 4, 2004. On November 9, 2004, a jury found Ingram guilty on both counts. Ingram is currently serving a 36-month sentence.

## II. ISSUE ON APPEAL

Ingram appeals his convictions, arguing that the district court erred in denying his motion to dismiss the indictment. He maintains that his Sixth Amendment right to a speedy trial was violated when two years passed between his indictment and trial.[2] He argues that the district court erred when it adopted the recommendations of the magistrate judge, finding that Ingram was partially responsible for the delay and that he could not demonstrate actual prejudice resulting from the delay. The Government argues that the district court correctly determined that Ingram was partially responsible for the delay and that Ingram has not demonstrated actual prejudice.

## III. STANDARD OF REVIEW

"Determination of whether a defendant's constitutional right to a speedy trial has been violated is a mixed question of law and fact. Questions of law are reviewed *de*

---

[2]Ingram also makes an argument that the two and one-half year delay before indictment violated his Fifth Amendment due process rights; but he concedes that he cannot demonstrate that the delay was intentionally created by the Government for its tactical advantage. Therefore, his Fifth Amendment claim fails. *United States v. Foxman*, 87 F.3d 1220, 1223 (11th Cir. 1996) ("[S]ubstantial prejudice from delay, standing alone, does not violate due process. The delay must also be the product of a deliberate act by the government designed to gain a tactical advantage.") (citing *United States v. Mills*, 704 F.2d 1553, 1557 (11th Cir. 1983)).

*novo*, and findings of fact are reviewed under the clearly erroneous standard." *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (citing *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir.1994)).

## IV. DISCUSSION

In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972), the Supreme Court established a four-factor test to determine when a defendant's constitutional right to a speedy trial has been violated. The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant. 407 U.S. at 530, 92 S. Ct. at 2192. "[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay . . . ." *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 2690-91 (1992) (citing *Barker*, 407 U.S. at 530-531, 92 S. Ct. at 2192). "Only if this threshold point is satisfied may the court proceed with the final three factors in the *Barker* analysis." *Clark*, 83 F.3d at 1352. Delays exceeding one year are generally found to be "presumptively prejudicial." *Doggett*, 505 U.S. at 652 n. 1, 112 S. Ct. at 2691 n. 1; *see also Clark*, 83 F.3d at 1352. If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to

7

succeed in showing a violation of his right to a speedy trial. *Doggett*, 505 U.S. 647, 112 S. Ct. 2686.

In this case, the magistrate judge identified the four factors of the *Barker* test and made findings regarding against which party each factor weighed. However, the magistrate judge and the district court failed to complete the *Barker* analysis by stating how heavily each factor weighs against the identified party. We perform that analysis.

The district court found, and the Government concedes, that factor (1), the length of post-indictment delay, satisfies the threshold requirement so as to entitle Ingram to a presumption of prejudice sufficient to proceed with the other considerations in the *Barker* analysis. We agree and find that the two-year delay between indictment and trial requires us to proceed with the *Barker* test.[3]

In considering factor (2), the reason for the post-indictment delay, the district court found that Ingram contributed to the delay by "making himself difficult to locate." The district court based this finding on three subsidiary factual determinations: (1) Ingram changed his cell phone number; (2) Ingram disconnected his home phone; and (3) Ingram did not respond to the numerous messages Agent

---

[3]The district court's factual finding that the post-indictment delay totaled 21 months is clearly erroneous. The relevant delay is the time between the date of the indictment and the trial date. *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003). Ingram was indicted on October 25, 2002; trial commenced during the first week of November 2004. Thus, the delay between indictment and trial was just over 24 months, or two years.

Kunz left for him at his place of employment. If the district court was correct, Ingram must demonstrate actual prejudice to prevail. *See Clark*, 83 F.3d at 1354. Ingram argues, however, that the district court clearly erred in attributing any fault for the delay to him. We agree.

"A defendant has no duty to bring himself to trial; the [Government] has that duty . . . ." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190. "Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pre-trial delay." *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (citation and internal quotation marks omitted). However, a defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay. *See id.*; *Rayborn v. Scully*, 858 F.2d 84, 90 (2d Cir. 1988) ("While it is true that a defendant is not under any obligation to take affirmative steps to ensure that he will be tried in a timely fashion, a court need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial.") (citation omitted).

The district court made no finding that Ingram intentionally evaded prosecution. For this reason alone the court clearly erred in attributing part of the delay to Ingram. But, even if the court had found Ingram intentionally evaded arrest, such a finding

9

would be clearly erroneous under the facts of this case. There is no evidence Ingram knew of the indictment or the arrest warrant at any time during the two years preceding his voluntary surrender. *See Doggett*, 505 U.S. at 654, 112 S. Ct. at 2691 (holding that a defendant who left for Colombia after indictment could not be faulted for post-indictment delay because there was no evidence he was aware of the indictment or that the police had been looking for him); *Brown*, 169 F.3d at 349 (holding that the government failed to prove the defendant was culpable for the delay because it failed to present credible evidence the defendant was aware of the indictment and intentionally hid himself from law enforcement agents). Not only is there no evidence Ingram knew of the indictment or arrest warrant, but there is no evidence Ingram even suspected Agent Kunz planned on arresting him. His offense was a nonviolent crime; he had already explained to Agent Kunz he made a mistake in filling out the form; more than two and one-half years had passed since he last heard from Kunz; and the messages Kunz left (assuming Ingram received them) never said why he wanted to speak with Ingram.

The fact that the phone numbers Ingram gave Kunz were no longer valid two and one-half years later and the fact that Ingram did not return messages Kunz left for him at work do not support a finding that Ingram intended to evade arrest, particularly where there is no evidence Ingram was cognizant of the pending charges. There are

10

many innocent reasons why someone's phone numbers might change over the course of two and one-half years. At the time, cell phone numbers were not portable, and switching cell phone providers meant changing cell phone numbers. Moreover, Ingram's brother testified that Ingram's home phone was disconnected because Ingram failed to pay the bill. With regard to the finding that Ingram did not return the messages Kunz left at Ingram's place of work, there is simply no evidence that Ingram ever received them.

Further, Ingram's actions are inconsistent with a finding of willful evasion. Ingram returned Kunz's call in December of 2002 and gave him additional contact information. Although Ingram gave Kunz an incorrect phone number, there is no evidence Ingram was trying to throw Kunz off his trail or that Ingram's actions even had this effect. If Ingram's purpose was to evade arrest, he could have done so by simply ignoring Kunz's feeble efforts to locate him. But this is not what Ingram did; instead he took affirmative steps to contact Kunz and voluntarily surrendered as soon as he learned of the indictment and arrest warrant.

Thus, the district court clearly erred in holding Ingram culpable for part of the delay. In the absence of any fault attributable to Ingram, we find that the delay was caused entirely by the Government. Therefore, this factor weighs against the Government.

The district court found that factor (3), the defendant's assertion of his right to a speedy trial, weighs against the Government. There is no error in this finding. Indeed, the Government concedes that "Ingram properly asserted his right to a speedy trial."

Because we find that all three of these *Barker* factors weigh against the Government, we proceed to determine whether they do so heavily. If they do not, then Ingram must demonstrate factor (4), actual prejudice, to succeed in his appeal. As stated above, the district court did not perform this part of the *Barker* analysis.

In *Clark*, we found that a seventeen-month delay due to Government negligence was insufficient to excuse that defendant, indicted on six counts of controlled substance violations and one count of carrying firearms during a drug trafficking crime, from the requirement that he demonstrate actual prejudice. However, *Clark* itself is clear that, "there is no hard and fast rule to apply here, and each case must be decided on its own facts." *Clark*, 83 F.3d at 1354. When we consider the facts of this case, we conclude that each of the first three factors in the *Barker* test weigh heavily against the Government.

The post-indictment delay in this case was two years, twice the threshold for presuming prejudice. "In cases of government negligence, our concern for substantiating prejudice decreases as the period of delay increases." *Id.* at 1353. The

Supreme Court has instructed, "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691. We have not considered the pre-indictment delay (two and one-half years) in our decision that the length of the post-indictment delay (two years) is sufficient for us to proceed to consider the other *Barker* factors. Only pretrial delay following a person's arrest, charge, or indictment is relevant to whether the Speedy Trial Clause of the Sixth Amendment is triggered. *See United States v. Lovasco*, 431 U.S. 783, 788-89, 97 S. Ct. 2044, 2048 (1977) (holding pre-indictment delay is "wholly irrelevant" to whether the Sixth Amendment speedy trial analysis is engaged) (quoting *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971)). But once the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government. *See United States v. Watson*, 599 F.2d 1149, 1157 (2d Cir. 1979) (stating "'preindictment' delay may have *some* relevance to the analysis of the speedy trial right," but concluding the post-indictment period not long enough to "raise a Sixth Amendment issue"); *United States v. Vispi*, 545 F.2d 328, 333 (2d Cir. 1976) (stating that the delay between the government's discovery of the offense and its filing of the information was relevant in assessing whether the post-information delay was intolerably long for purposes of the Sixth Amendment right to a speedy trial). The

rationale for presuming prejudice is, after all, that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2693. Thus, the two-year post-indictment delay in this case weighs more heavily than a two-year delay in another case might if, in that case, the post-indictment delay began shortly after the allegedly criminal acts occurred.

Comparing this case to *Clark*, not only is the delay more weighty here; the Government's negligence in creating the delay is more egregious in this case. As the magistrate judge outlined in her report, there was much more that the Government could have done to arrest Ingram. While the magistrate judge found that the efforts that Kunz did make were "in good faith," she made no finding as to whether the investigation was performed diligently. After a review of the record, we find that it was not.

Unlike *Clark*, where police officers failed to arrest the defendant because they believed that the U.S. Marshal's office was planning to execute the arrest warrant, the record in this case does not support any reasonable explanation for the Government's neglect in executing the warrant. Considering the crime for which Ingram was indicted, the state of the proof against him on the date of the indictment, and the Government's knowledge of Ingram's whereabouts, we find the two-year post-

indictment delay intolerable. *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."). In October 2002, Kunz knew that he was the only law enforcement agent responsible for arresting Ingram; and he had more than enough information to do so. He knew where Ingram lived and worked and that Ingram had a brother who was a Fort Lauderdale policeman. Ingram neither moved nor changed jobs during the almost five years between the alleged offense and the trial. While it is true that Kunz had difficulty reaching Ingram by telephone, Kunz's efforts to contact Ingram were less than weak. Post-indictment, Kunz never visited Ingram's place of employment (where he had originally interviewed Ingram); and he visited Ingram's residence only once when, not finding Ingram there, he relied on an unidentified (and undescribed) person outside the residence who told him that Ingram did not live there anymore. Kunz did not contact Ingram's brother to ask Ingram's whereabouts. Neither did he refer the case to another law enforcement agency.

Finally, when Kunz finally made telephone contact with Ingram, Ingram agreed to turn himself in on the charges and promptly asserted his right to a speedy trial. We fail to see merit in the Government's argument that, while Ingram did everything he should to assert his right to a speedy trial, this should not weigh heavily against the Government.

15

The first three *Barker* factors all weigh heavily against the Government. Thus, Ingram need not demonstrate actual prejudice resulting from the delay. The indictment must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Ingram's convictions are reversed. The case is remanded to the district court with instructions to dismiss the indictment.

**REVERSED AND REMANDED.**