**UNITED STATES of America,**

v.

**Frank MORENO, Defendant.**

**No. 1:11–CR–246–DNH–1.**

United States District Court,
N.D. New York.

Feb. 19, 2014.

Hinckley, Allen Law Firm, of Counsel, Samuel C. Breslin, Esq., Albany, NY, for Defendant.

Richard S. Hartunian, United States Attorney for the Northern District of New York, of Counsel, Robert A. Sharpe, Esq., Ass't United States Attorney, Albany, NY.

### MEMORANDUM—DECISION and ORDER

DAVID N. HURD, District Judge.

#### TABLE OF CONTENTS

I. INTRODUCTION ................................................. 169

II. BACKGROUND ................................................. 169
 1. Pre–Indictment Investigation ........................... 169
 2. Moreno's Whereabouts .................................. 170
 3. Initial Arrest Operation ............................... 170
 4. Post–Indictment Efforts ............................... 171

III. DISCUSSION ................................................. 171
 1. Sixth Amendment ...................................... 171
 2. Length of the Delay ................................... 172
 3. Reasons for the Delay ................................. 174
 A. Operation Block Crusher ........................... 175
 B. May 26, 2011, to September 6, 2012 ................ 176
 C. September 6, 2012, to September 9, 2013 ........... 178
 4. Defendant's Assertion of the Right .................... 179
 5. Prejudice to Defendant ................................ 179

 6. Balancing the Factors ..........................................181

 IV. CONCLUSION and ORDER ..........................................181

EXHIBIT A ..........................................182

## I. *INTRODUCTION*

On May 26, 2011, the United States of America (the "Government") unsealed a nine-count indictment charging defendant Frank Moreno ("Moreno") and fifteen others with various drug and conspiracy offenses. Although federal arrest warrants were issued and all of his co-defendants were quickly rounded up as part of a coordinated law enforcement operation, Moreno remained a free man for 837 days. When he was finally arrested, it was on a completely unrelated charge—driving on a suspended license.

Moreno now moves to dismiss the federal indictment, with prejudice, alleging a violation of his Sixth Amendment right to a speedy trial. The motion has been fully briefed. Oral argument was heard on Friday, February 7, 2014, in Utica, New York. Decision was reserved.

## II. *BACKGROUND* [1]

On May 20, 2011, a federal grand jury sitting in the Northern District of New York returned a sealed indictment charging sixteen individuals with conspiracy to possess and distribute cocaine and heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and § 846. Gov. Ex. 1.[2] Moreno is charged in Count One of this indictment, which alleges that he conspired with others to procure cocaine and heroin in New York City for distribution to co-conspirators in Upstate New York and elsewhere between 2008 and September 2010. *Id.* A federal arrest warrant was issued for Moreno the same day. Gov. Ex. 3.

On May 26, 2011, the Government unsealed the indictment. A superseding indictment was later filed on October 20, 2011, which added additional counts and forfeiture allegations against Moreno's co-defendants. Gov. Ex. 2. It also extended the ending date of the alleged conspiracy to "May 2011." *Id.* Moreno remained charged in Count One. *Id.*

On September 9, 2013—nearly twenty-eight months after the Government unsealed the indictment against him in the Northern District of New York—Moreno was arrested by officers with the New York Police Department (the "N.Y.P.D.") for driving on a suspended license. Breslin Aff. ¶ 13. After the outstanding federal warrant was discovered, Moreno was transferred to this federal district and pleaded "not guilty" to Count One of the superseding indictment. *Id.* ¶ 30. Counsel was appointed and asserted Moreno's Sixth Amendment speedy trial right at a detention hearing on December 13, 2013. *Id.* ¶ 34. On January 10, 2014, Moreno filed this motion to dismiss.

### 1. *Pre–Indictment Investigation*

For weeks prior to the return of the indictment against Moreno, the Federal Bureau of Investigation ("FBI") had been planning and organizing a large-scale arrest operation ("Operation Block Crusher") consisting of thirty-nine separate teams of FBI investigators. Gov. Ex. 5. Operation Block Crusher was intended to simultaneously arrest Moreno, his codefendants, and a number of individuals charged

---

1. The following facts are drawn from the parties' affidavits and supporting exhibits. Unless otherwise noted, these facts are undisputed.

2. The Government's exhibits are attached to its opposition memorandum.

under similar indictments. *Id.* Each of these individuals were allegedly involved in a drug-dealing organization known as the Four Block Gang, which originated from the Hamilton Hill neighborhood of Schenectady, New York, and operated throughout eastern Upstate New York and areas of Vermont. *Id.*

Although nearly all of the FBI's targets were located in the Schenectady area, the FBI believed Moreno and one of his co-defendants, a man named Terrance Neal, were living somewhere in New York City. *Id.* An eight-person FBI investigative team ("Team 31") was specifically tasked with locating and arresting Moreno during Operation Block Crusher. Gov. Exs. 5, 15.[3] Team 31 prepared for this arrest operation by establishing "leads" on Moreno's likely whereabouts. *Id.* On May 4, 2011, electronic searches of criminal history databases in New York and New Jersey revealed that Moreno had been arrested a number of times between 1994 and 2006. Gov. Ex. 7. These searches revealed several street addresses associated with these prior arrests. *Id.*

The most recent entry in these databases was a September 27, 2006, arrest in New Jersey. *Id.* This entry reported Moreno's address as 40 Morrow Ave in Scarsdale, New York ("40 Morrow Ave."). *Id.* The New York criminal history database reported a typographically incorrect version of the same address—"40 Mattow Ave. Apt 2R, Srarsdale, NY"—associated with a term of probation in Westchester County from June 25, 2008, to April 24, 2010. *Id.* The FBI had also received infor-

mation from informants that suggested Moreno might be living at two other addresses in Bronx, New York: 716 Beck Street and 2816 Roebling Avenue. Gov. Ex. 15.

### 2. *Moreno's Whereabouts*

Moreno has maintained 40 Morrow Ave. as his legal and mailing address for the past eight years. Teresa Moreno Aff. ¶ 3 ("Teresa Aff."); Breslin Aff. ¶ 19. He shares this residence with his sister, Teresa Moreno. Teresa Aff. ¶ 3. She has claimed Moreno as a dependent on her federally filed tax returns using his own name and social security number for the 2010, 2011, and 2012, tax years. *See* Teresa Aff., Ex. A.

On August 9, 2011, Moreno obtained a New York State-issued identification card from the Department of Motor Vehicles ("DMV") using his real name and 40 Morrow Ave. Gov. Mem. 5; Teresa Aff. ¶ 4; Breslin Aff. ¶ 27. On April 28, 2012, Moreno was involved in an automobile accident and filed a personal injury lawsuit in his own name in Bronx Supreme Court. Breslin Aff. ¶ 26. On June 25, 2013, a request for judicial intervention was electronically filed with the New York State Unified Court System in connection with this ongoing lawsuit.[4] Breslin Aff., Ex. B. An undated copy of a delinquent juror notice from Westchester County also lists Moreno's address as 40 Morrow Ave. Breslin Aff., Ex. C.

### 3. *Initial Arrest Operation*

On May 26, 2011, the Government unsealed the indictments and simultaneously executed Operation Block Crusher.[5] Gov.

---

3. The Government provided sealed exhibit 15 to the Court and Moreno's counsel at oral argument.

4. Moreno also claims to have been involved in criminal court proceedings in Bronx, New York, on at least two occasions during the relevant time period, but cannot provide evidence in support of this contention. *See*

Breslin Aff. ¶ 24. The Government argues that this must be false because any law enforcement official who checked his information against the NCIC database would have discovered the outstanding arrest warrant.

5. Moreno's arrest warrant was entered into the FBI's National Crime Information Center ("NCIC") database on May 26,2011. Gov.

Ex. 5. Team 31 investigated the two addresses in Bronx, New York, in its attempt to locate Moreno, but it is unclear whether the FBI ever investigated 40 Morrow Ave.[6] Although Team 31's operational planning documents indicated that 40 Morrow Ave. was one of the three locations where Moreno might be found, a review of the "site survey" attached to this plan includes only the two Bronx, New York, locations as targeted addresses. *See* Gov. Ex. 15. Despite Operation Block Crusher's overwhelming success, Team 31's initial efforts to locate and arrest Moreno were met with failure.

### 4. *Post–Indictment Efforts* [7]

On July 12, 2011, a routine NCIC database search revealed a potential match for Moreno. Gov. Ex. 10. This information was sent to the FBI field office in Albany, New York, but it is unclear whether the Albany office conducted any follow-up. *Id.*

On June 14, 2012, the FBI Albany office conducted a proffer session with one of the individuals arrested in connection with the Four Block gang's criminal activities. Gov. Ex. 12. This individual identified a photograph of Moreno, indicated he had dealt with him on prior drug deals, and believed Moreno had been living somewhere in Bronx, New York, as recently as June 2010. *Id.* The Government contends that the FBI followed up on this information by "check[ing] with Con Edison to attempt to locate utility bills" in Moreno's name, but has not provided any evidentiary support for this contention. Gov. Mem. 7. The next day, the FBI contacted the Airline Reporting Corporation in Arlington, Virginia, to see if Moreno had purchased any tickets using his name or social security number. Gov. Ex. 13.

On September 6, 2012, DEA agents in Norfolk, Virginia, arrested an individual on unrelated charges. Gov. Ex. 14. This individual claimed to have purchased heroin from Moreno in the past, suggested Moreno was living on Randalls Avenue in Bronx, New York, and provided the telephone number of one of Moreno's alleged criminal associates. *Id.* The DEA agents alerted the FBI field office in Albany, New York, to this information. The Government contends that the FBI subpoenaed cell phone records and obtained a "Trap and Trace Order" on this telephone number, but has not provided any evidentiary support for this contention. Gov. Mem. 7. This is the last effort by the Government to locate and arrest Moreno, over a year before his "accidental" arrest.

## III. *DISCUSSION*

### 1. *Sixth Amendment*

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. The right created by the Speedy Trial Clause of the Sixth Amendment enjoys recognition as "one of the most basic rights preserved by our Constitution." *Klopfer v. North Carolina*, 386 U.S. 213, 226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Yet this right has also been acknowledged as "amorphous, slippery, and necessarily relative." *United States v. Ray*, 578 F.3d 184, 191 (2d Cir. 2009) (quoting *Vermont v. Brillon*, 556 U.S. 81, 89, 129 S.Ct. 1283, 173 L.Ed.2d

---

Ex. 4. This is an FBI-controlled database that contains information for recent and outstanding arrest warrants. Both federal and state law enforcement officials can access the system to determine whether a person has outstanding arrest warrants.

**6.** However, there is no evidence the FBI ever physically visited 40 Morrow Ave. or made any effort to contact Moreno's sister, Teresa Moreno.

**7.** Attached as Exhibit A is a post-indictment chronology of confirmed events.

231 (2009)). "It neither prohibits all delays, nor establishes a strict time limit between the announcement of a charge and the commencement of trial." *Id.*

 A determination of whether a criminal defendant's right to a speedy trial has been violated is "circumstance-dependent and determined by [a] multi-factor balancing test" that weighs "the conduct of both the prosecution and the defendant." *Id.* (citation omitted). This multi-factor balancing test examines: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the extent of prejudice to the defendant. *United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). As the Supreme Court has explained:

> [N]one of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. . . . [T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Barker,* 407 U.S. at 533, 92 S.Ct. 2182. Indeed, *"Barker's* formulation necessarily compels courts to approach speedy trial cases on an ad hoc basis." *Brillon,* 556 U.S. at 91, 129 S:Ct. 1283 (citation and internal quotation marks omitted); *see also Barker,* 407 U.S. at 521, 92 S.Ct. 2182 (noting it is "impossible to determine with precision when the [speedy trial] right has been denied"). Accordingly, "reasonable minds may disagree in close cases on whether the balance of factors tips in favor of recognizing a violation of the Speedy Trial Clause." *Ray,* 578 F.3d at 191.

### 2. *Length of the Delay*

 A court evaluating an alleged violation of a defendant's speedy trial right must first determine whether the length of the delay "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States,* 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *Barker,* 407 U.S. at 530, 92 S.Ct. 2182 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). Courts in the Second Circuit have noted that there is a "general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not." *See, e.g., United States v. Ostroff,* 340 F.Supp.2d 362, 366 (S.D.N.Y.2004) (quoting *Vassell,* 970 F.2d at 1164).

The parties agree that the delay between Moreno's indictment and arrest is "presumptively prejudicial" and that an analysis of the four *Barker* factors is necessary. Def.'s Mem. 3; Gov. Mem. 10. Moreno further argues that this delay qualifies as "uncommonly long." Def.'s Mem. 5. The Government asserts that the length of the delay is "merely a gateway into the other factors" and that it is "not necessarily dispositive." Gov. Mem. 9.

██ As an initial matter, Moreno's constant reference to the date the indictment was returned and sealed is incorrect. It is true that the right to a speedy trial attaches upon a defendant's "arrest, indictment, or other official accusation." *Doggett,* 505 U.S. at 655, 112 S.Ct. 2686. However, the length of delay for Sixth Amendment purposes is properly measured from the date when the indictment is unsealed. *United States v. Cherico,* 769 F.Supp.2d 560, 570 (S.D.N.Y.2011).

Here, Moreno's indictment was unsealed on May 26, 2011, and he was apprehended on September 9, 2013. Therefore, the resulting delay for purposes of this motion is 837 days. Because this delay is over three

times longer than the "presumptively prejudicial" threshold of eight months, a full analysis of the four *Barker* factors is warranted.

■ The first *Barker* factor further requires a court to determine whether the post-indictment delay was "uncommonly long" for the offense at issue. *United States v. Valiente–Mejia*, No. 04–CR–772(NRB), 2009 WL 3401210, at *6 (S.D.N.Y. Oct. 19, 2009) (citing *Doggett*, 505 U.S. at 651, 112 S.Ct. 2686). Although there is no bright-line rule for making this assessment, the Supreme Court has explained that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531, 92 S.Ct. 2182.

■ The Government does not directly contest Moreno's assertion that the delay was "uncommonly long," but rather provides a string citation to ten different cases ostensibly illustrative of its otherwise correct argument that "delays ranging from 28 months to over 9 years were not dispositive for dismissal." Gov. Mem. 9. Moreno correctly distinguishes each of these cited cases as involving "defendants that were fully aware of their cases, and either themselves or other intervening forces caused the delay." Def.'s Reply Mem. 8.

■ "[T]here is no clear definition for an 'uncommonly long' delay." *Ostroff*, 340 F.Supp.2d at 367. Because the *Barker* analysis is necessarily a contextual one, courts have looked to several factors in determining whether the delay at issue was "uncommonly long." For instance, shorter periods of time than the one at issue here were found to be "uncommonly long" where the government bore the brunt of the responsibility for the delay. *See United States v. Ingram*, 446 F.3d 1332 (11th Cir.2006) (two-year delay between indictment and arrest resulted in

dismissal where delay was due to government inaction and where there was no evidence defendant was evading law enforcement); *United States v. Vispi*, 545 F.2d 328, 333 (2d Cir.1976) (finding a twenty-month delay "unduly long" where such delay "rest[ed] squarely at the door of the district court itself").

In contrast, courts have tolerated a broad spectrum of delays where the defendant was responsible in whole or in part for the holdup. *See, e.g., United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir.1990) (finding no Sixth Amendment violation where "most of the 26 months at issue was consumed by consideration of defendants' various pretrial motions"); *Rayborn v. Scully*, 858 F.2d 84 (2d Cir.1988) (seven-year delay between indictment and trial did not violate Sixth Amendment where defendant was responsible for bulk of delay). The delay at issue here was neither caused by any dilatory motion practice attributable to Moreno nor, as discussed below, any purposeful evasion of law enforcement.

Recently, the Second Circuit has also looked to the nature and complexity of the allegations to analyze whether the first *Barker* factor favored a defendant alleging a speedy trial violation. *See United States v. Cain*, 671 F.3d 271, 296 (2d Cir.2012) (characterizing a delay of twenty-two months as "largely neutral" where multiple defendants were charged in a thirty-two count indictment with a series of complex racketeering charges). In *Cain*, the charges involved five co-defendants and thirty-two counts of illegal racketeering activity predicated on "twenty [different] violations of state or federal law." *Id.* at 278.

Here, Moreno was charged in only one count of a nine-count indictment as part of a drug conspiracy with fifteen co-defendants. Gov. Ex. 1. A superseding indict-

ment later added five counts and forfeiture allegations against other co-defendants. Gov. Ex. 2. While these fourteen counts involve conduct alleged to have occurred over a period between 2008 and May 2011, they are predicated on three violations of federal law and do not rise to the level of complexity associated with the charges against the defendant claiming a speedy trial violation in *Cain. See* 671 F.3d at 296.

More importantly, all of the other fifteen targets under indictment were arrested within a few days of Operation Block Crusher's initial execution. Moreno spent the vast majority of the 837 days prior to his coincidental arrest by the N.Y.P.D. as the only defendant remaining a focus of the Government's search efforts. A review of the context of this case merits a finding that the delay at issue was "uncommonly long."

Accordingly, this factor weighs against the Government.

### 3. *Reasons for the Delay*

The second *Barker* factor is "[t]he flag all litigants seek to capture." *United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). It requires a court to determine "whether the Government is more to blame for the delay than the defendant." *United States v. Leaver,* 358 F.Supp.2d 255, 265 (S.D.N.Y.2004). The Government has a "constitutional duty to make a diligent good faith effort to bring [an accused] to trial without unnecessary delay." *United States v. Diacolios,* 837 F.2d 79, 82 (2d Cir.1988) (internal quotations omitted). However, "[t]he determination as to whether [the Government] has made sufficient efforts to satisfy the 'due diligence' requirement is a fact-specific one ... and the precise amount of effort that is required is apt to vary depending on the circumstances of the case." *Rayborn,* 858 F.2d at 90.

*Barker* instructs that "different weights should be assigned to different reasons" advanced to explain the delay. 407 U.S. at 531, 92 S.Ct. 2182. A finding that the Government has deliberately delayed in order to acquire a tactical advantage weighs heavily in favor of the defendant. *Brillon,* 556 U.S. at 82, 129 S.Ct. 1283. Conversely, "delay caused by the defense weighs against the defendant." *Id.* "Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground." *Doggett,* 505 U.S. at 656–57, 112 S.Ct. 2686. "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Id.* at 657, 112 S.Ct. 2686.

Neither party argues that the delay was the result of the Government's bad faith. And despite the Government's suggestions to the contrary, the delay at issue here cannot be in any way attributed to Moreno. There is no evidence that Moreno was aware of the federal indictment in the Northern District of New York prior to his unrelated arrest by the N.Y.P.D. during a traffic stop. *See* Teresa Aff. ¶¶ 6, 9–12; Breslin Aff. ¶¶ 12, 20. Similarly, there is no evidence that Moreno adopted an alias or was otherwise attempting to avoid detection by law enforcement during the relevant time period. *See* Teresa Aff. ¶ 7; Breslin Aff. ¶¶ 16, 20. In fact, as noted below, he appears to have engaged in many acts which would have exposed his whereabouts to law enforcement authorities.

Although the Government indicated at oral argument that it did not find Teresa Moreno's affidavit "particularly credible," it has not provided any evidence to chal-

lenge its veracity. There is no doubt that Teresa Moreno's affidavit would be entitled to little evidentiary weight if it were all that had been provided for consideration in support of Moreno's argument. However, Moreno has provided evidence of an ongoing personal injury lawsuit with several public filings as well as tax documents confirming that he allowed his sister to claim him as a dependent using his real name and social security number for three years in a row. Further, the Government acknowledges that Moreno sought and obtained a New York State-issued identification card in the period after his indictment using his own name and the 40 Morrow Ave. address. When this evidence is considered against the Government's own submissions indicating 40 Morrow Ave. was a viable address as well as its lack of any evidence to suggest that Moreno had adopted an alias or was otherwise a fugitive, it is clear that Moreno was not actively evading law enforcement. Accordingly, the Government's post-indictment efforts must be examined to determine whether it was negligent in its efforts to locate and arrest Moreno.

### 3A. *Operation Block Crusher*

Moreno argues that although the Government was aware of the 40 Morrow Ave. address during the entire time period, it never visited or otherwise investigated this address. Def.'s Reply Mem. 2. The Government asserts that "[l]aw enforcement has never heard anything about the sister and her address." Gov. Mem. 3. It further argues that although Teresa Moreno's federal tax returns list the 40 Morrow Ave. address, this is irrelevant because "the FBI never had any information about the sister, where she was, or whether she had any involvement or contact with the defendant, or that he might be staying with her." *Id.* 6.

At the outset, the Government's assertion that it was completely unaware of 40 Morrow Ave. is troubling given the contradictory nature of the evidence it has submitted in support of that position. Both the New York and New Jersey criminal history database checks conducted in preparation for Operation Block Crusher clearly listed 40 Morrow Ave. as a possible location for Moreno. Gov. Ex. 5. Team 31's operational planning documents further confirm an awareness of 40 Morrow Ave. as a location where Moreno might be found. Gov. Ex. 15. The Government implicitly concedes this point by further arguing that 40 Morrow Ave. was simply an "old address" and that "other checks" provided more current information about Moreno's potential location. Gov. Mem. 6. Specifically, it asserts that the information it developed led it to concentrate its investigatory efforts on the two locations in Bronx, New York.

While it may be true that the FBI had developed other, arguably more viable "leads" related to Moreno's location, it stretches the truth to argue that the 40 Morrow Ave. address was so dated as to have become completely irrelevant. The search of the New York and New Jersey criminal history databases conducted on May 4, 2011, revealed that the 40 Morrow Ave. address was associated with both a 2006 arrest in New Jersey and a probation term in Westchester County, New York, ending as recently as April 24,2010. Gov. Ex. 7. Although this information was over a year old at the time of the pre-operation investigation, the Bronx, New York, addresses were similarly outdated—the Government's sources indicated that the 716 Beck Street address was only "current as of July, 2010." Gov. Ex. 6.

When questioned about this apparent irregularity at oral argument, the Government's counsel explained that 40 Morrow Ave. had been "safety listed" by the Drug Enforcement Agency ("DEA"), which was

an electronic alert designed to facilitate the exchange of information between the DEA and the FBI. The FBI had contacted the DEA regarding 40 Morrow Ave., and its agents indicated they had not found Moreno there when they had visited that address during a 2010 investigation. These agents further informed the FBI that "other sources" indicated that Moreno was "frequenting" the 719 Beck Street location in Bronx, New York, along with "other areas in Brooklyn." Apparently in reliance on the DEA's information regarding its 2010 investigation, Team 31 visited the 719 Beck Street address on the day of the arrest operation and interviewed people who had seen Moreno there "within days."

The Government's further assertion that it was completely unaware of Teresa Moreno's existence does little to help its argument. As it correctly points out, the FBI had developed information that Terrance Neal, the other individual believed to be living in New York City, might be residing at the home of one of his relatives, Tiffany Neal. *Id.* Even assuming the FBI had no basis for discovering Teresa Moreno's tax returns, the FBI was nevertheless aware of the 40 Morrow Ave. address for weeks before the arrest operation was conducted. The fact that Teresa Moreno's existence was never discovered and that she was never interviewed or otherwise contacted as part of the search for her brother lends further support to the proposition that 40 Morrow Ave. was simply never investigated. *See* Teresa Aff. ¶ 11. Indeed, the Government's counsel conceded at oral argument that it is unaware whether the FBI or any other agency ever visited or otherwise investigated 40 Morrow Ave. either during the arrest operation or at any point in the ensuing two years, three months, and fourteen days prior to Moreno's arrest by the N.Y.P.D.

Although there are rarely any black-and-white answers about how to effectively pursue an investigation, it is clear that this one started off on the wrong foot. But as one district court has cautioned, "it is important to avoid the temptation to rely on unfair 'hindsight' or to engage in excessive 'Monday morning quarterbacking'" in evaluating the Government's post-indictment efforts. *Valiente–Mejia,* 2009 WL 3401210, at *8 (internal citation and quotations marks omitted). With that principle in mind, it would be unfair to weigh the Government's failure to initially investigate 40 Morrow Ave. too heavily in resolving Moreno's claim. Accordingly, a further evaluation of the Government's post-indictment efforts is required.

### 3B. *May 26, 2011, to September 6, 2012*

Moreno argues that the Government is "wholly responsible for the delay" through its own negligence and "demonstrated low priority" in bringing him to trial. Def.'s Reply Mem. 10. The Government asserts "it was diligent in its pursuit of the defendant." Gov. Mem. 11.

█ First, the Government correctly distinguishes Moreno's case from instances where law enforcement officials negligently failed to enter a defendant's search warrant into electronic databases. *See, e.g., United States v. Diaz,* No. 09–CR–608 (N.D.N.Y. Feb. 11, 2013) (McAvoy, S.J.) (dismissing indictment where the arrest warrant was not entered into the NCIC database for nearly thirty months). It asserts that Moreno's arrest warrant was immediately entered into the NCIC database. Gov. Ex. 4. However, merely "[e]ntering a criminal defendant's name into a database is a routine matter and does not satisfy the government's diligence obligation." *United States v. Fernandes,* 618 F.Supp.2d 62, 70 (D.D.C.2009) (citation

omitted). It also provides evidence of a routine NCIC database search performed a short time later, and asserts that it "followed up" on this information by "check[ing] with Con Edison to attempt to locate utility bills" in Moreno's name. Gov. Mem. 7; Gov. Ex. 10. Courts have routinely found that such efforts militate in favor of the Government's assertion of reasonable diligence. *Valiente–Mejia,* 2009 WL 3401210, at *10 (collecting cases).

But the Government's remaining efforts beyond these initial database entries and searches can only be described as anemic. This is underscored by the Government's attack on the relevance of the New York State-issued identification card listing Moreno's real name and the 40 Morrow Ave. address. The Government argues that the identification card was not obtained until after the electronic database searches "had been initially run by the FBI" and that the FBI case agent "spoke with a DMV representative" who confirmed that the identification card was obtained on August 9, 2011. Gov Mem. 5. This argument only highlights the fact that the database searches were run before the indictment against Moreno was returned and therefore weighs against a finding of post-indictment diligence. *But see Valiente–Mejia,* 2009 WL 3401210, at *8 (finding the Government's failure to apprehend the defendant despite its ongoing records searches was reasonable given that defendant was using a fake address, fake social security number, and fake date of birth).

The Government next argues that an informant had identified Moreno and that the FBI "followed up on address locations" provided by this individual. Gov. Mem. 5. These proffered exhibits are dated September 16, 2010, and January 12, 2011, months prior to Moreno's indictment on May 20, 2011, and therefore cannot support a finding of post-indictment diligence. *See* Gov. Exs. 8–9. Even so, a review of these exhibits reveals that they do not support the Government's claims. The transcript of the informant's conversation reveals that he believed Moreno had stopped using the 719 Beck Street location following a July 14, 2010, search of that address by law enforcement officials and that Moreno was now living somewhere in Connecticut. Gov. Ex. 8. Notably, that address—719 Beck Street—is the address Team 31 chose to investigate during Operation Block Crusher despite the apparent indication that such an address was no longer in use.

The Government next argues that it received new leads on Moreno's location during a June 14, 2012, "proffer session" with one of the defendants arrested during Operation Block Crusher. Gov. Mem. 7. It asserts that it followed up on that information the very next day by contacting the Airline Reporting Corporation in Arlington, Virginia, to see if Moreno had purchased any plane tickets using his name or social security number. Gov. Ex. 13. Puzzlingly, the Government asserts this inquiry was connected to the proffer session because the informant suggested Moreno was present in Virginia. Gov. Mem. 7. However, Government's Exhibit 12 does not contain references to Moreno's conduct in Virginia. Rather, it contains information regarding events in the greater New York City area in 2010 and a single reference to a co-defendant's conduct in Virginia. Gov. Ex. 12. Nevertheless, it is reasonable to assume the FBI suspected Moreno may have been traveling elsewhere and therefore this database search weighs in favor of the Government's diligence.

Finally, DEA agents arrested an individual on unrelated charges on September 6, 2012, who indicated that he knew Moreno. Gov. Ex. 14. The DEA contacted the FBI field office in Albany, New York, to alert

them of this information. *Id.* The arrestee advised the agents that Moreno was still living in Bronx, New York, but "that he did not know the exact address so his description was not very specific." *Id.* He further advised that he knew the telephone number of one of Moreno's alleged criminal associates. *Id.* The Government asserts that it subpoenaed cell phone records and obtained a "Trap and Trace Order" on this number, but has not provided any evidentiary support for this contention. Gov. Mem. 7.

Therefore, the Government has established that in the year immediately following Moreno's indictment: (1) it entered Moreno's arrest warrant into the NCIC database; (2) it followed up on information from a July 2011, database search; (3) it checked to see if Moreno had purchased plane tickets in June 2012; and (4) it received information from the DEA indicating that Moreno was still living in New York City. If these initial efforts were properly described as anemic, the Government's further efforts can only be described as completely non-existent.

### 3C. *September 6, 2012, to September 9, 2013*

Even assuming the Government's failure to investigate 40 Morrow Ave. was justified, its own submissions indicate that it ceased all efforts to search for Moreno despite evidence that Moreno remained living in New York City and waited passively for over a year before Moreno was accidentally arrested by the N.Y.P.D. during a traffic stop. The Government has provided no evidence of any efforts taken between September 6, 2012, and September 9, 2013. There were no routine NCIC database searches; no ongoing interviews with co-defendants to develop new information; no further airline checks; no friendly phone calls from the DEA; and no parallel efforts by other state or federal agencies. *See Rayborn,* 858 F.2d at 90

(noting that law enforcement agencies can rely in good faith on the efforts of another jurisdiction's law enforcement where a defendant "has fled to parts unknown"). However, the Government's evidence does not establish that Moreno had fled to parts unknown. Rather, it establishes that Moreno was still living in the same areas of New York City he had always frequented. Indeed, the most current information from the DEA was that Moreno was still living in Bronx, New York.

█ "Reasonable diligence demands serious efforts." *Fernandes,* 618 F.Supp.2d at 70 (quoting *Doggett,* 505 U.S. at 652, 112 S.Ct. 2686 (internal quotation marks and alterations omitted)). The initial failure of Operation Block Crusher did not absolve the Government of its continuing obligation to pursue Moreno. *Doggett,* 505 U.S. at 656, 112 S.Ct. 2686 ("[I]f the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail."); *United States v. Erenas–Luna,* 560 F.3d 772, 775 (8th Cir.2009) (finding Government negligence where a defendant's case had "slipped through the cracks" such that no one was actively searching for him).

Although pretrial delay is often both inevitable and perfectly justifiable, "society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." *Barker,* 407 U.S. at 527, 92 S.Ct. 2182. Clearly, the Government chose to wait passively for Providence to deliver Moreno into its hands after its few initial efforts failed. While this may have been a rational allocation of limited resources, the Government must bear the burden if such a decision results in "prolonged and prejudicial delays." *Leaver,* 358 F.Supp.2d at 272. Because the Government was negli-

gent in its pursuit of Moreno, it must shoulder the blame for the delay.

Accordingly, this factor weighs against the Government.

### 4. *Defendant's Assertion of the Right*

The third *Barker* factor requires a court to determine whether the defendant timely asserted his right to a speedy trial. 407 U.S. at 531, 92 S.Ct. 2182. Where a defendant was ignorant of the indictment, he cannot be "taxed for invoking his speedy trial right only after his arrest." *Doggett*, 505 U.S. at 654, 112 S.Ct. 2686. However, this factor "appears to be most relevant in the context of a habeas petition based on the denial of the defendant's right to a speedy trial, where that right was not raised in trial court, or was raised late." *Leaver*, 358 F.Supp.2d at 265.

Here, there is no evidence that Moreno was aware of the indictment in the Northern District of New York while he was living in the New York City area. Following his arrest by the N.Y.P.D. and transfer to federal custody upon discovery of the outstanding warrant, he promptly asserted his Sixth Amendment right following appointment of counsel. *Compare Leaver*, 358 F.Supp.2d at 272 (finding third factor to weigh against the Government where defendant was unaware of his indictment prior to his arrest); *with United States v. Blanco*, 861 F.2d 773, 780 (2d Cir.1988) (finding that a defendant's assertion of the right "[did] not help her case" where she was aware of the indictment but only invoked it subsequent to her arrest).

The Government suggests that "the heroin trafficker arrested in Virginia knew of Moreno's indictment and warrant." Gov. Mem. 12. This knowledge cannot be imputed to Moreno, and the Government has provided no other basis to make such a finding. *See Doggett*, 505 U.S. at 653–54, 112 S.Ct. 2686 (finding that although defendant's mother was aware of the indict-

ment, her further testimony that she had never informed him was unrebutted by the Government).

Accordingly, this factor weighs against the Government.

### 5. *Prejudice to Defendant*

The fourth *Barker* factor requires a court to analyze prejudice to the defendant "in light of the interests of defendants which the speedy trial right was designed to protect." 407 U.S. at 532, 92 S.Ct. 2182. The Supreme Court has identified these interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Id.*

Because the evidence establishes that Moreno was unaware of the federal indictment or outstanding warrant for his arrest until he was apprehended by the N.Y.P.D., he can only seriously argue the third interest—the extent to which his defense will be impaired. The *Barker* court considered this third interest to be the most serious, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* at 532, 92 S.Ct. 2182; *see also Leaver*, 358 F.Supp.2d at 268 ("[T]he major purpose of the Sixth Amendment is to protect against the impairment of the accused's defense.").

The Government concedes that the delay at issue here creates a presumption of prejudice, but argues that Moreno "has not sufficiently particularized how the delay in prosecution has prejudiced his ability to prepare and present an adequate defense." Gov. Mem. 12–13. Moreno contends he will suffer specific prejudice because the Government has secured a number of cooperating witnesses, all of whom were able to negotiate plea agreements and "get their stories straight" by trans-

ferring blame to Moreno, the lone remaining co-defendant. Def.'s Mem. 12.

■ *Barker* prejudice "is concerned with impediments to the ability of the defense to make its own case (e.g., if defense witnesses are made unavailable due to the government's delay); the opportunity for the prosecution to prepare for trial does not, on its own, amount to prejudice to the defense." *United States v. Abad*, 514 F.3d 271, 275 (2d Cir.2008) (citing *Barker*, 407 U.S. at 532, 92 S.Ct. 2182); *see also United States v. Toombs*, 574 F.3d 1262, 1275 (10th Cir.2009) (noting same where a delay permitted the Government to "procure the testimony of [a] co-defendant"). Therefore, the mere fact that the Government has negotiated plea bargains and procured the testimony of Moreno's co-defendants cannot alone support a showing of prejudice.

However, Moreno also argues that he will suffer because the passage of time has resulted in lost evidence, missing witnesses, faded memories, and manipulated testimony. Def.'s Mem. 10. He emphasizes that the factual predicate for the conspiracy charge against him is a series of extremely brief telephone calls between Moreno and an unindicted co-conspirator named "Reese Wilbur" totaling less than thirty minutes in length and that these calls are now over three years old. Breslin Aff. ¶ 32. Moreno's counsel at oral argument noted that "my client could have addressed, could have remembered, and justified" these phone calls. This is precisely the kind of prejudice contemplated by *Barker*. 407 U.S. at 532, 92 S.Ct. 2182 (noting prejudice "if defense witnesses are unable to recall accurately events of the distant past").

■ In any event, Moreno is not necessarily required to demonstrate specific prejudice to prevail on this fourth *Barker* factor. "*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Doggett*, 505 U.S. at 655, 112 S.Ct. 2686 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182). "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* Accordingly, prejudice is presumed where there is a "prolonged and unjustifiable delays ... in prosecution." *Leaver*, 358 F.Supp.2d at 272 (quoting *Doggett*, 505 U.S. at 657, 112 S.Ct. 2686).

■ The strength of this presumption is "intertwined with the reason for, and length of, the delay." *United States v. Ramos*, 420 F.Supp.2d 241, 251 (S.D.N.Y. 2006). Although Government negligence is less prejudicial than deliberate delay, the weight assigned to such official negligence "compounds over time as the presumption of evidentiary prejudice grows." *Id.* (quoting *Doggett*, 505 U.S. at 657, 112 S.Ct. 2686). While this presumption alone cannot carry a Sixth Amendment claim, "it is part of the mix of relevant facts, and its importance increases with the length of delay." *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686; *see also United States v. Jones*, 129 F.3d 718, 724 (2d Cir.1997) ("[C]ourts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice." (citation and internal quotation marks omitted)).

Although the post-indictment delay in this case was shorter than in some other cases, it still exceeds the "presumptively prejudicial" threshold by more than a factor of three. And as noted above, the Government must shoulder the entire blame for a delay of over twenty-seven months. *See Ramos*, 420 F.Supp.2d at 252 (noting defendant's reliance on presumptive prejudice "would be considerably more compelling if the Government was primarily responsible for the delay"). The delay

in this case carries a presumption of prejudice, and the Government has failed to offer any evidence to rebut it.

Accordingly, this factor weighs against the Government.

### 6. *Balancing the Factors*

■■■ "Everyone doubtless has his or her own idea of what constitutes 'speedy,' but the Sixth Amendment does not define the term." *United States v. Ghailani,* 751 F.Supp.2d 515, 528 (S.D.N.Y.2010) (footnote omitted), *aff'd,* 733 F.3d 29 (2d Cir. 2013). Therefore, "[a] common thread throughout Sixth Amendment jurisprudence is that the second *Barker* factor—determining the party that bears blame for the delay—drives the ultimate balancing of factors and hence resolution of the speedy trial issue." *Fernandes,* 618 F.Supp.2d at 74. Here, this all-important factor completely favors Moreno. He was blameless for the delay and, although the delay was not the product of bad faith, the Government failed to exercise reasonable diligence in its efforts to locate him. The few affirmative steps it did take early on were either routine or ineffective. *Most importantly, the Government completely ceased its investigative efforts for over a year before Moreno was coincidentally arrested by the N.Y.P.D. during a routine traffic stop.* (emphasis added).

The remaining *Barker* factors also weigh against the Government. While the twenty-seven month delay between Moreno's indictment and arrest is not as extraordinary as in some other cases, it is over three times as long as the threshold requirement needed to trigger a *Barker* analysis. Because the 837 day delay was "uncommonly long," this factor weighs against the Government. Likewise, Moreno cannot be taxed on the third *Barker* factor because he was unaware of the indictment and asserted his speedy trial rights promptly following his arrest. Finally, the Government has failed to rebut the presumption of prejudice to Moreno's defense. All four factors weigh heavily against the Government.

Accordingly, the Government cannot satisfy its Sixth Amendment obligation to provide Moreno with a speedy trial.

## IV. *CONCLUSION*

■■■ The Supreme Court has made it clear that the "only possible remedy" for the denial of a criminal defendant's speedy trial right is dismissal of the indictment. *Barker,* 407 U.S. at 522, 92 S.Ct. 2182. "This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried." *Id.* But such an uncomfortable reality cannot excuse the Government's duty to prosecute its caseload with reasonable diligence. Nor can it justify a federal court's departure from its duty to fairly adjudicate the cases that come before it. Otherwise, the speedy trial requirements in the Sixth Amendment of the U.S. Constitution become meaningless.

Accordingly, the indictment must be dismissed.

Therefore, it is

ORDERED that

1. Defendant Frank Moreno's motion to dismiss the indictment as against him, with prejudice, is GRANTED;

2. The indictment against defendant Frank Moreno is DISMISSED, with prejudice; and

3. The United States Marshal's Service is directed to release defendant Frank Moreno from custody immediately upon the filing of this Order.

IT IS SO ORDERED.

## Exhibit A
### CONFIRMED POST–INDICTMENT CHRONOLOGY

#### 2011

| | |
|---|---|
| 1. May 20, 2011 | Grand Jury returns sealed indictment |
| 2. May 26, 2011 | Government unseals indictment; Team 31 investigates 719 Beck Street in Bronx, New York, during Operation Block Crusher; Moreno's arrest warrant is entered into the FBI's national NCIC database |
| 3. July 12, 2011 | Routine NCIC database search reveals potential match and this information is sent to the FBI field office in Albany, New York |
| 4. August 9, 2011 | Moreno receives New York State-issued non-driver identification card listing his real name and the 40 Morrow Ave. address |

#### 2012

| | |
|---|---|
| 5. April 24, 2012 | Teresa Moreno files 2011 tax return listing her address as 40 Morrow Ave. and claiming Moreno as a dependent using his real name and social security number |
| 6. April 28, 2012 | Moreno is involved in an automobile accident and files a personal injury lawsuit in Bronx Supreme Court using his real name |
| 7. June 14, 2012 | FBI conducts "proffer session" with co-defendant who believes Moreno is still living in Bronx, New York |
| 8. June 15, 2012 | FBI contacts Airline Reporting Corporation in Arlington, Virginia |
| 9. September 6, 2012 | DEA agents alert FBI to information suggesting Moreno is still living in Bronx, New York |

#### 2013

| | |
|---|---|
| 10. January 30, 2013 | Teresa Moreno files 2012 tax return listing her address as 40 Morrow Ave. and claiming Moreno as a dependent using his real name and social security number |
| 11. June 25, 2013 | Moreno files request for judicial intervention in ongoing personal injury lawsuit |
| 12. September 9, 2013 | Moreno is arrested by N.Y.P.D. during a traffic stop |